**Pamela BERGERON, Plaintiff,**

v.

**William J. HENDERSON, U.S. Postmaster General, et al., Defendants.**

**No. Civ. 98–362–P–C.**

United States District Court, D. Maine.

April 7, 1999.

Cynthia Dill, Portland, Maine, for plaintiff.

David R. Collins, AUSA Office of the U.S. Attorney, Portland, Maine, Jay P. McCloskey, U.S. Attorney's Office, Bangor, Maine, for defendant United States Postmaster General.

Donald F. Fontaine, Fontaine & Beal, P.A., Portland, Maine, James L. Linsey, Cohen, Weiss & Simon, New York City, for defendant Maine Merged Branch, National Association of Letter Carriers, AFL—CIO.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Plaintiff Pamela Bergeron filed a six-count Complaint against the United States Postmaster, the Maine Merged Branch 92, National Association of Letter Carriers ("Union"), and Paul Robinson and Tom Ostrowski, in their individual capacities, on October 23, 1998 (Docket No. 1). She filed an Amended Complaint with only slight changes on November 3, 1998 (Docket No. 2), and the Court granted a motion to amend the Amended Complaint to add a state law claim against the Union on March 30, 1999 (Docket No. 15) ("Amended Complaint"). Counts I and II of the Amended Complaint allege that the United States Postal Service sexually harassed and discriminated against Ms. Bergeron and retaliated against her for pursuing complaints with the Maine Human Rights Commission, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"). In Count III, Ms. Bergeron alleges that the Union sexually harassed and discriminated against her in violation of Title VII. The remaining three counts of the Amended Complaint raise state-law claims of intentional infliction of emotional distress (Count IV), negligent infliction of emotion-

al distress (Count V), and defamation (Count VI) against the individually named Defendants, Mr. Robinson and Mr. Ostrowski.

On January 12, 1999, the United States Attorney for the District of Maine filed a Certificate of Scope of Employment certifying that Robinson and Ostrowski, were acting within the scope of their employment with the postal service in regard to the allegations in the Plaintiff's Amended Complaint (Docket No. 3). On the same day, the Postmaster General and the United States filed an Answer to Plaintiff's Amended Complaint wherein the United States denied on its own behalf, as well as on behalf of Robinson and Ostrowski the allegations contained in Counts IV, V, and VI. *See* Answer (Docket No. 4) ¶¶ 56, 57, 59, 60, 62, 63, 64. Robinson and Ostrowski have not filed an answer to the Complaint or to the Amended Complaint on their own behalf.

From 1984 until 1998, Plaintiff worked as a postal letter carrier for the United States Postal Service at Saco, Maine. *See* Amended Complaint ¶ 10. Mr. Robinson is the Postmaster of the Biddeford Annex. *See* Declaration of Paul E. Robinson (Docket No. 20) ("Robinson Declaration") ¶ 2. Mr. Ostrowski was Plaintiff's immediate supervisor and his formal title is Supervisor, Customer Services. *See* Declaration of Thomas Ostrowski (Docket No. 21) ("Ostrowski Declaration") ¶ 2. Mr. Ostrowski's primary duties include evaluating the daily workload, making carrier and route assignments for the letter carriers, making temporary changes in route and time schedules, and authorizing overtime work. *See id.* The primary functions of Mr. Robinson's position are the general supervision of the employees at the Biddeford Annex and responsibility for community relations between the postal service branch offices and the towns they serve. *See* Robinson Declaration ¶ 2. He is responsible for the processing, distribution, delivery, and collection of mail in Biddeford, Saco, and Old Orchard, Maine. *See id.* Presently before

the Court are Defendants Postmaster General and the United States of America's Motion to Substitute and Motion to Dismiss, In Part, and Incorporated Memorandum of Law (Docket No. 5). In their motion to substitute, Defendants move the Court to substitute the United States in place of the individually named Defendants, Robinson and Ostrowski, as to Counts IV–VI of the Amended Complaint pursuant to the Westfall Act, 28 U.S.C. § 2679. The premise of Defendants' motion to dismiss is that Plaintiff's claims against the United States are precluded by the Federal Torts Claim Act ("FTCA") and the Federal Employee Compensation Act ("FECA"). Also before the Court is Plaintiff's Motion and Incorporated Memorandum of Law for Entry of Default Against Defendants Robinson and Ostrowski (Docket No. 14).

## DISCUSSION

### A. Motion to Substitute the United States for Robinson and Ostrowski.

In 1988, Congress amended the FTCA to reinforce federal employees' immunity from tort actions. These amendments— commonly known as the "Westfall Act" because they were a response to *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988)—provide that an action against the United States is the only remedy for injuries caused by federal employees acting within the scope of their employment.[1] The Westfall Act provides in pertinent part:

(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any

civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions· of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). Accordingly, after a federal employee is sued, the Attorney General[2] reviews the case to determine if the employee was acting within the scope of his or her employment when he or she engaged in the allegedly harmful conduct. The Attorney General may then file a Certification of Scope of Employment, a document certifying that the employee was acting within the scope of his or her employment. *See id.* Substitution of the United States as the exclusive defendant under the Westfall Act confers immunity on the defendant employee. Upon such certification, the employee is dismissed from the action, the United States is substituted as defendant, and the case proceeds under the FTCA against the United States.

The United States Attorney for the District of Maine has certified that at the time of the alleged conduct in this case, Defendants Robinson and Ostrowski were acting within the scope of their employment as employees of the United States. *See* Certificate of Scope of Employment (Docket No. 3). In the certificate, the United States Attorney specifically certified all allegations of the Amended Complaint regarding intentional and negligent infliction of emotional distress and defamation. *See id.* Plaintiff correctly argues, however, that, although the first move, the Attorney General's certification is not the "final word" on the matter of scope of employment. *See Gutierrez de Martinez,* 515

---

**1.** In *Westfall,* the Supreme Court held that to gain immunity from a suit for a common-law tort, a federal employee would have to show (1) that he was acting within the scope of his employment, and (2) that he was performing a discretionary function. *See Westfall v. Erwin,* 484 U.S. at 299, 108 S.Ct. at 585. In enacting 28 U.S.C. § 2679(d)(1), the underlying purpose was to delete the "discretionary

function" requirement. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 425–26, 115 S.Ct. 2227, 2232, 132 L.Ed.2d 375 (1995).

**2.** The Attorney General has delegated certification authority to the United States Attorneys. *See* 28 C.F.R. § 15.3.

U.S. at 434, 115 S.Ct. at 2236. The Supreme Court has held that "the Attorney General's certification that a federal employee was acting within the scope of his employment—a certification the executive official, in cases of the kind at issue, has a compelling interest to grant—does not conclusively establish as correct the substitution of the United States as defendant in place of the employee." *Id.* at 434, 115 S.Ct. at 2236. Thus, although Westfall certification serves as *prima facie* evidence that Defendants Robinson and Ostrowski were acting within the scope of their employment, *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir.1991), it does not conclusively establish that the United States should ultimately be substituted as the party defendant since the certification is subject to judicial review.

Plaintiff challenges the United States Attorney's certification, claiming that the pleaded facts allege that Robinson and Ostrowski acted outside the scope of their employment, requiring the Court to independently review the certification and determine whether the Defendants were in fact acting within the scope of their employment. If the Court finds that the employee was acting outside the scope of his or her employment, the Court must refuse to substitute the United States. If the Court agrees with the certification, then the case proceeds against the United States under the FTCA. Plaintiff relies on the allegations in her Amended Complaint and the attached documents which include a sworn affidavit submitted by Plaintiff to the Equal Employment Office ("EEO") ("EEO Investigative Affidavit") to demonstrate that Ostrowski and Robinson were acting outside of the scope of their employment at the time of the incidents out of which Plaintiff's claims arise.

The United States Court of Appeals for the First Circuit has held that in situations, such as this one, where a plaintiff asserts that a defendant acted outside the scope of his or her employment despite the Attorney General's certification to the contrary, the burden of proof is on the plaintiff. *See Day v. Massachusetts Air National Guard,* 167 F.3d 678, 685 (1st Cir.1999); *Lyons v. Brown,* 158 F.3d 605, 610 (1st Cir.1998); *Rogers v. Management Technology, Inc.,* 123 F.3d 34, 36–37 (1st Cir.1997); *Aversa v. United States,* 99 F.3d 1200, 1209 (1st Cir.1996). State law controls the determination of whether a federal employee was acting within the scope of employment. *See Lyons,* 158 F.3d at 609 (citing *Aversa,* 99 F.3d at 1208–09); *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991). Maine courts apply section 228 of the *Restatement (Second) of Agency* on the issue of scope of employment. *McLain v. Training and Development Corp.,* 572 A.2d 494, 497 (Me. 1990). The principles set forth in the *Restatement (Second)* regarding the scope of employment are the following:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) force is intentionally used by the servant against another the use of force is not unexpectable by the master

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Restatement (Second) of Agency* § 228, at 504 (1958). Section 230 of the *Restatement (Second) of Agency* clarifies that "an act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Similarly, section 231 of the *Restatement (Second)* states that "an act may be within the scope of employment although consciously criminal or tortious." Finally, "acts relating to work and done in

the workplace during working hours are within the scope, *see id.* §§ 229, 233, 234; negligent performance of duties is within the scope, *see id.* §§ 232–33, while serious intentional wrongdoing is outside it, *see id.* § 231, and the motivation of the employee (to serve the master's interests or his own) is often an important element, *see id.* §§ 235–36." *Lyons,* 158 F.3d at 609. Thus, actions that are done with a private, rather than a work-related, purpose to commit wrongdoing are outside of the scope of employment and render the motivation of the employee, in performing the act at issue a crucial, immunity-related fact.

Having outlined the general contours of Maine agency law, the Court must determine the proper method of review of a Westfall certification. In *Wood v. United States,* 995 F.2d 1122, 1123–24 (1st Cir. 1993) (en banc), a Secretary for the Army brought a tort action in federal court against the United States and an Army official alleging, among other claims against the United States, that the official had committed sexual harassment and assault and battery in violation of Massachusetts state law. The United States Attorney filed a Westfall Certificate that flatly denied that the incidents of which plaintiff complained had occurred and concluded that "at all times referenced in the Complaint ...," the official was "acting within the scope of his office...." *Id.* at 1124. The certification was accompanied by an affidavit wherein the official likewise denied all of the plaintiff's factual allegations. *See id.* The district court held that the Westfall certification was inadequate. *See id.* at 1124. After an analysis of the underlying purpose and history of the Westfall Act and the FTCA, the Court of Appeals for the First Circuit, sitting *en banc,* agreed with the district court that an "Attorney General should not be able, by denying the incident, to obtain employee immunity for a tort claim that is not job-related, regardless of whether the Attorney General believes the claim to be true or false." *Id.* at 1126.

■ In holding that an Attorney General may not deny the harm-causing incident completely, the Court of Appeals for the First Circuit clarified the proper form that a Westfall certificate must take. That court stated that an Attorney General need not accept completely a plaintiff's characterization of the conduct. *See id.* at 1129. Specifically, that court explained:

> we can (and do) insist that the certificate assume some kind of harm-causing incident, while leaving the Attorney General free to dispute characterizations of the incident and subsidiary immunity-related facts.... Moreover, we previously held that the Attorney General's certificate may contest a plaintiff's incident-describing and incident-characterizing facts and that the court may resolve any such factual conflicts relevant to immunity, prior to trial. In *Nasuti v. Scannell,* 906 F.2d 802 (1st Cir.1990), the plaintiff, injured while riding in the back of a government truck driven by federal employee Scannell, sued Scannell, claiming that Scannell had intentionally injured him by driving fast, thereby jostling him, and throwing him from side to side, "in spite of" Nasuti's "entreaties" to stop. We assumed that these factual allegations, if true, would have placed Scannell's actions outside the "scope of his employment."... But, we held the immunity certificate valid, pending a pre-trial evidentiary hearing that would resolve the key immunity-related factual dispute, namely whether Scannell intended to harm Nasuti. *See id.* at 808. The Attorney General's certificate in Nasuti did not deny the existence of a harm-causing incident. It denied related descriptions and characterizations of that incident. By way of contrast the certificate before us denies the existence of any harm-causing incident at all.

*Id.* Accordingly, the purpose of a Westfall certificate is to dispute the plaintiff's characterization of the incident at issue and the Attorney General need not accept com-

pletely a plaintiff's characterization of the conduct. In disputing the characterization of the conduct, the Attorney General creates a conflict on the immunity-related facts. A district court, reviewing a Westfall certificate and considering whether the United States is the proper party defendant and whether the federal employee is immune from suit, must also assume that the "harm-causing" incident occurred and resolve the incident and subsidiary immunity-related facts that bear on the characterization of that incident.

The basic analysis developed in *Wood* was further refined in *Lyons v. Brown*, 158 F.3d 605, 606 (1st Cir.1998), where an employee sued the Secretary of the Department of Veterans Affairs under Title VII and brought state law claims against her supervisor for infliction of emotional distress, slander, and assault and battery. The Attorney General certified the supervisor's behavior in regard to a number of specific acts, including a work complaint that the supervisor filed against plaintiff, his challenges to her test requests, and his refusals to talk to her at the hospital, but did not certify the inappropriate hugging and pushing alleged in the complaint. *See id.* at 607. The United States Court of Appeals for the First Circuit restated the analysis developed in *Wood* and further instructed that, in cases where multiple incidents make up the claims against the federal employee, the "scope test" must be applied specifically to each of the acts or incidents contained in the complaint that make up each claim, rather than broadly to the claims or complaint as a whole. *See Lyons*, 158 F.3d at 608–09. The *Lyons* court also identified immunity-related facts under Maine agency law that, if in dispute, may require an evidentiary hearing on the issue of immunity. Relying on the Second Restatement, the court reasoned that if seemingly work-related acts taken by the federal employee are done with a private purpose on the employee's part to retaliate or discriminate against the plaintiff, they may be outside the scope of employment under Maine law. *See Lyons*, 158 F.3d at

610. However, if the act or incident was done in good faith to serve the employer's interest, then the conduct is likely within the scope of employment even if the federal employee's judgment was mistaken. *See id.*

■ Having set forth the basic substantive principles that guide the Court's analysis of whether Robinson and Ostrowski acted within the scope of their employment, the Court must determine the proper procedure that it must follow. Immunity-related issues should be decided by the judge at the earliest opportunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (it is both immunity from ultimate liability after trial and immunity from the burden of going to trial at all that matters). The United States Court of Appeals for the Seventh Circuit in *Taboas v. Mlynczak*, 149 F.3d 576 (7th Cir.1998), outlined the possible procedures available in requests for immunity under the Westfall Act. In that case, the court presented the following alternatives:

> A motion for substitution may be decided on the face of the complaint (akin to a motion to dismiss) when the movant contends that, even accepting the allegations of the complaint as true, the defendant acted within the scope of employment.... In the alternative, the motion for substitution may be decided by reference to affidavits and other evidence outside the pleadings (akin to a summary judgment motion) if the movant contests the facts as pled and the plaintiff is unable to demonstrate that a genuine issue of material fact exists with respect to scope of employment.... The more difficult question is how to proceed when the motion for substitution contests the facts pled in the complaint, as in a motion for summary judgment, and the summary judgment papers reveal disputed factual issues. In such a case, the district court may hold an evidentiary hearing to resolve material factual

disputes related to the scope of employment.

*Taboas,* 149 F.3d at 580–82 (internal citations omitted). The Court of Appeals for the First Circuit agrees that immunity determinations are akin to summary judgment proceedings when affidavits and other evidence outside the pleadings are submitted and the relevant facts are in conflict. *See Day,* 167 F.3d at 686. In *Lyons,* the Court of Appeals for the First Circuit likewise concluded that if a plaintiff's "proffer so warrants and the facts alleged are in controversy," the Court may hold an evidentiary hearing to resolve the scope of employment issues. *Lyons,* 158 F.3d at 610. In *Day,* the court further clarified under what circumstances it is appropriate for a court to conduct an evidentiary hearing. The Court held that a plaintiff must present evidence and not rest on the allegations of his or her complaint when the government has contradicted those allegations with materials of evidentiary quality. *See Day,* 167 F.3d at 685–86. Thus, once the government has submitted outside evidence, a party contesting the certification may not, according to the court, rely on quasi-legal generalities in an unverified complaint. *See id.* at 686. That court further stated that, "[b]efore a court is called upon to convene an evidentiary hearing, it is entitled to something more than conclusory abstractions from the party demanding the hearing." *Id.*

■ A synthesis of the case law of the last few years regarding procedures to apply following the filing of a Westfall certificate leads the Court to the following conclusions: A motion for substitution may be decided on the face of the complaint (akin to a motion to dismiss) when the movant contends that, even accepting the allegations of the complaint as true, the defendant acted within the scope of employment. *See Taboas,* 149 F.3d at 580–82. When, upon the motion for substitution, the movant contests the facts as pled, the motion may be decided by the court by

reference to affidavits and other evidence outside the pleadings (akin to a summary judgment motion). *See id.* The district court, in reviewing a Westfall certificate, must assume that the "harm-causing" incident occurred and resolve the conflicts in the immunity-related facts, or the characterization of the incident, relevant under state law to the scope-of-employment analysis. *See Wood,* 995 F.2d at 1129. Finally, in the situation where the motion for substitution contests the facts pled in the complaint, as in a motion for summary judgment, and the summary judgment papers reveal disputed factual issues, the district court may hold an evidentiary hearing to resolve material factual disputes related to the scope of employment. *See Day,* 167 F.3d at 686; *Lyons,* 158 F.3d at 610; *Taboas,* F.3d at 582. To be entitled to an evidentiary hearing, a party challenging a Westfall certificate must justify the need for one by presenting evidence of facts that create a genuine conflict in the immunity-related facts; the party may not rely primarily on generalities in unverified pleadings. *See Day,* 167 F.3d at 686; *Lyons,* 158 F.3d at 610. At all times, a plaintiff who challenges a government's certification under the Westfall Act bears the burden of proving that the individual-employee defendant acted outside the scope of his employment. *See id.; Rogers,* 123 F.3d at 36–37; *Aversa,* 99 F.3d at 1209.

■ Here, Plaintiff has alleged in her Amended Complaint that a number of the acts undertaken by Robinson and Ostrowski were done with deliberate intent to harass or retaliate against her. Under Maine law, if Plaintiff's allegations are true, these acts are outside of the scope of employment. The government has provided an objective justification for each act and incident identified by Plaintiff's Amended Complaint and has supported its explanations with sworn declarations by Robinson and Ostrowski. In its papers, the government has thoroughly explained Robinson and Ostrowski's motives and rea-

sons for the action taken. In her challenge to Defendants' motion to substitute the United States as defendant to this action, Plaintiff rests on the general quasi-legal allegations made in her unverified Amended Complaint and statements made in her sworn EEO Investigative Affidavit that, in regard to a number of the acts and incidents, Robinson and Ostrowski acted with a private, rather than any work-related, purpose to harass, intimidate, and retaliate against her.

In accordance with the ruling of the Court of Appeals for the First Circuit in *Lyons*, the Court examines the nine separate acts or incidents alleged in the Amended Complaint that involve Robinson and Ostrowski, and which comprise Plaintiff's claims in Counts IV, V, and VI to ascertain whether the acts were conducted outside the scope of employment.[3] The Court will consider the motion to substitute, by reference to the evidence submitted by the parties, as akin to a summary judgment motion. The Court groups the paragraphs of the Amended Complaint into the nine specific acts and incidents that relate to Robinson and Ostrowski. At the outset, the Court finds that all of the acts and incidents that relate to Robinson and Ostrowski occurred in the authorized time and space limits of their employment, *see Restatement (Second)* § 228(1)(b), and that none of the conduct involved force, *see id.* § 228(1)(d). In this case, as to all of the acts at issue, the immunity-related facts pertain to the characterization of the employees' reasons for, and motivation behind, the conduct.

First, Plaintiff alleges that Robinson and Ostrowski purposefully placed her "case"[4] opposite that of Bruce Wainwright, who Robinson and Ostrowski knew had "exposed himself" to Plaintiff in 1985, and who was particularly offensive to Plaintiff.

In regard to this act, Plaintiff alleges the following:

22. In September of 1996 the letter carriers from surrounding post offices were moved to the Annex in Saco, Maine. Before the official move, one weekend plaintiff went to the new Annex with Mary Ann Hackett to see the new location. Postmaster Robinson, and supervisor Tom Ostrowski were there when plaintiff discovered that Wainwright's case had been put directly across from hers. Plaintiff became very upset and told Robinson and Ostrowski that she did not want to be so close to Wainwright based on what he had done, and Robinson said "Oh, what did he do just expose himself or something?". Plaintiff's case remained where it was and she complained regularly to Ostrowski and Robinson about how uncomfortable she was being near Wainwright. Plaintiff believes that she complained to either Robinson or Ostrowski each month about the ongoing harassment and hostile work environment. Plaintiff began taking anti-anxiety medication before going to work. At one point Robinson suggested sarcastically that plaintiff turn her case so that it faces outward, which was not an acceptable solution, because she would be the only person facing out, which would ostracize her even more.

39. When plaintiff returned to work on January 21, 1998, Bruce Wainwright was still placed directly across from her and continued to stare and whisper in an intimidating manner. Both Robinson and

---

3. The government provides an explanation to Plaintiff's allegations in paragraph 25 of the Amended Complaint. It is not clear to the Court that these allegations pertain to Robinson and Ostrowski and are part of Counts IV, V, and VI. Accordingly, the Court has not

discussed the conduct alleged in this paragraph.

4. The Court understands "case" to mean a postal employee's work station.

Ostrowski were aware of it and how much it bothered plaintiff, and failed to do anything about it. Plaintiff had specifically mentioned in her first complaint to the EEO counselor, and had regularly complained about her proximity to Wainwright to both Ostrowski and Robinson. Plaintiff believes that the positioning of Wainwright to her in the first place was retaliation, and after specifically complaining about the situation, she was ridiculed and her concerns were belittled. Plaintiff was forced to confront Wainwright and his disgusting gestures, remarks and odor even though plaintiff, as well as her doctors, made it clear to Ostrowski and Robinson that this was a intolerable situation.

Amended Complaint ¶¶ 22, 39. The government agrees that Plaintiff told Ostrowski and Robinson in September of 1996 about Wainwright's prior behavior including the fact that he had exposed himself to her in 1985. *See* Reply to Plaintiff's Objection to Federal Defendants' Motion to Substitute and Motion for Partial Dismissal ("Government's Reply") (Docket No. 18) at 7. However, according to Robinson and Ostrowski, Plaintiff agreed to try working across from Wainwright. *See Id.* Furthermore, the government contends that Plaintiff did not report to them that Wainwright had continued to sexually harass her since 1994. *See Id.* The government explains that the cases were set up in route sequence and that there was a 30-foot open area separating Wainwright and Bergeron. *See* Robinson Declaration ¶ 4; Ostrowski Declaration ¶ 3.

The arrangement of the cases in the Saco office is the kind of task that Robinson and Ostrowski, as supervisors of the post office, were employed to perform. *See Restatement (Second)* § 228(1)(a). In addition, the arrangement of the office is unquestionably actuated, at least in part, to serve the post office as the cases are set up in route sequence presumably to aid mail sorting. *See id.* § 228(1)(c). Plaintiff suggests in the Amended Complaint that Robinson was sarcastic and disrespectful in his interactions with her, ignored Plaintiff's reports of additional acts of sexual harassment, and refused her request for removal of her case. Plaintiff also alleges that Robinson or Ostrowski, in requiring her to work across from Wainwright, were intentionally harassing or retaliating against her. Plaintiff attests in her EEO Investigative Affidavit that she "complained regularly" to Robinson and Ostrowski about how uncomfortable she was "being near" Wainwright and that she "complained to either Robinson or Ostrowski every month about the ongoing harassment and hostile work environment." EEO Investigative Affidavit ¶ 14. In addition, when Plaintiff returned to work for the week of January 21 through January 27, 1998, Robinson and Ostrowski were aware that Wainwright "continued to stare and whisper." EEO Investigative Affidavit ¶ 25. She states that she believed "that the positioning of Wainwright to me in the first place was retaliation." *Id.*

The Court has before it a proffer by Plaintiff that disputes the government's explanation for the conduct and the facts regarding the placement of Plaintiff's case opposite Wainwright in controversy. Plaintiff's proffer that a private, non work-related purpose motivated Robinson and Ostrowski, if true, places this conduct outside the scope of employment. Plaintiff's proffer does not conclusively resolve that the placement of her case was due to a private retaliatory purpose that places this conduct outside the scope of employment. However, a genuine dispute as to the immunity-related facts exists on this record.

Plaintiff also contends that Ostrowski and Robinson actively condoned male postal employees' flirtations with a female postal employee named Doreen Lemay in Plaintiff's presence. Specifically, Plaintiff alleges as follows:

23. After the move to the Annex in 1996, the environment became increasingly hostile towards plaintiff and the other women who had come forward with complaints about sexual harassment. Many men would purposely touch, hug, kiss and engage in conversations about sex with Doreen Lemay in plaintiff's presence. Plaintiff complained to Robinson about the inappropriate touching and sexual encounters involving Doreen and certain men, and Robinson later said he had spoken to Doreen and since she was not offended by the conduct, it was acceptable. Plaintiff and Mary Ann Hackett were often timed when they were in the ladies bathroom, and not allowed to talk casually among themselves, even though their work was being performed satisfactorily. Ms. Lemay, on the other hand, would often walk around giggling and be fondled by men during work hours and was not spoken to by management. In fact, Ostrowski and Robinson routinely flirted and chatted for long periods of time with Lemay.

40. During the week in January 1998 when plaintiff attempted to go back to work, there also was continuation of inappropriate behavior between men and Doreen Lemay, which Ostrowski and Robinson knew about, participated in, and condoned. This was harassment and retaliation because plaintiff had specifically complained to Robinson about the interaction between Doreen and certain men, and felt strongly that her welcoming sexual advances made the environment hostile towards women who did not welcome such advances. As a result, Doreen was treated very well and enjoyed certain working benefits and women who did not welcome inappropriate

sexual advances or dirty jokes were punished.

41. Tom Ostrowski ordered plaintiff and two women who had complained about sexual harassment not to speak to one another at work. Meanwhile, Ostrowski spent a considerable amount of time flirting with Doreen in the hallway in front of plaintiff. This is discrimination and retaliation because Doreen, who has not complained about sexual harassment and welcomes sexual advances, has more privileges than women who have complained about sexual harassment. Doreen was rewarded by Ostrowski and Robinson for putting up with dirty jokes and engaging in overt sexual acts, and women who wanted and demanded a professional environment were punished.

Amended Complaint ¶¶ 23, 40, 41. The government explains that the Plaintiff approached Robinson and told him that she had observed male employees flirt with Doreen Lemay. *See* Government's Reply at 8; Robinson Declaration ¶ 5. Robinson declares that he has never observed this behavior himself and talked to all of the supervisors, who also indicated that they had not observed any inappropriate physical contact. *See* Robinson Declaration ¶ 5. Ostrowski also attests that he has never observed any inappropriate physical contact on the part of male employees with Lemay. *See* Ostrowski Declaration ¶ 4. Robinson asserts that he spoke to Lemay, who told him that she occasionally had physical contact with other male employees but that the contact had ceased after a supervisor informed all employees that this conduct was inappropriate. *See* Robinson Declaration ¶ 6. Likewise, neither Robinson nor Ostrowski were aware of any inappropriate conduct during the week of January of 1998. *See* Ostrowski Declaration ¶¶ 9–10; Robinson Declaration ¶ 20. Furthermore, both Robinson and Ostrowski deny having timed women in the bath-

room but, apparently in an effort to explain Plaintiff's allegation, admit that in the past, male and female employees have taken too long in the locker rooms. *See* Robinson Declaration ¶ 7; Ostrowski Declaration ¶ 4. Both deny having flirted with Lemay. *See* Robinson Declaration ¶ 8; Ostrowski Declaration ¶ 4. Finally, Ostrowski explains that he requested that employees cease talking to each other and return to work and that he had made this request in the past to Plaintiff. *See* Ostrowski Declaration ¶ 11.

The act of following up in regard to Plaintiff's complaints regarding Lemay is generally the kind of conduct Robinson and Ostrowski were employed to perform in their supervisory positions. The fact that they may not have responded in a manner considered appropriate by Plaintiff is immaterial on its own to the scope-of-employment analysis. Here, Plaintiff alleges in the Amended Complaint that Robinson and Ostrowski purposely flirted [5] with a female employee in her presence and, in order to harass her, favored a female employee who welcomed their, and other male employees', advances. In contrast, Robinson and Ostrowski flatly deny that they flirt with or favor Doreen Lemay. *See* Robinson Declaration ¶ 8; Ostrowski Declaration ¶ 4. Though the allegations in Plaintiff's Amended Complaint are not of evidentiary quality, in the EEO Investigative Affidavit, Plaintiff attests that Robinson was aware that male employees purposefully flirted with Doreen Lemay in her presence. *See* EEO Investigative Affidavit ¶ 15. She attests that, on one particular occasion, after ordering Plaintiff and two other female employees to stop talking,

> Ostrowski . . . spent a considerable amount of time flirting with Doreen in the hallway in front of Roger Derocher's desk in my presence. I feel this is discrimination and retaliation because

Doreen, who has not complained about sexual harassment and welcomes sexual advances, has more privileges than women who have complained about sexual harassment. . . .

*Id.* ¶ 26. The record before the Court regarding the flirtations with Doreen Lemay in the presence of Plaintiff is in conflict. Plaintiff has presented facts of evidentiary quality beyond the mere allegations in her Amended Complaint that dispute the government's explanation that no flirting occurred. Thus, there lies a genuine dispute as to the immunity-related issue of whether Robinson and Ostrowski interacted with Lemay in a flirtatious manner and permitted ongoing flirtations between other employees with the specific intent to retaliate and discriminate against Plaintiff.

Plaintiff also alleges that Ostrowski forced her to work an excessive amount of overtime and that the overtime system was manipulated in a manner that denied Plaintiff her compensation. In her Amended Complaint, she alleges:

24.  Plaintiff routinely placed her name on the overtime list in order to earn extra money to someday buy a farm in Vermont. Male Union members began refusing to work overtime when requested to by Ostrowski, who then ordered plaintiff to work excessive amounts of overtime. Male Union members then filed grievances, which the Union supported, claiming an inequity in the allocation of overtime hours in violation of their Union contract. Male Union members actually got paid for work they had refused to do; work that plaintiff did. This manipulation of the system and its burden on plaintiff was joked about and condoned by Union stewards.

---

**5.** Plaintiff refers to a broad range of conduct as "flirting." According to Plaintiff, the flirting consisted of touching, hugging, kissing, touching of breasts, "sexual backrubs," "rubbing bare legs in crotch areas," fondling, and engaging in conversations and joking about sex. EEO Investigative Affidavit ¶¶ 12, 15, 16.

Amended Complaint ¶ 24. The government contends that the distribution of overtime is governed by the terms of the collective bargaining agreement between the National Association of Letter Carriers ("NALC") and the postal service and that Robinson and Ostrowski did not purposefully manipulate the system. *See* Government's Reply at 9–10; Robinson Declaration ¶ 9; Ostrowski Declaration ¶ 5. In addition, Ostrowski asserts that the male letter carriers on the overtime delivery list did not refuse overtime assignments, as Plaintiff contends, and that Plaintiff has never complained about working overtime. *See* Ostrowski Declaration ¶ 5.

Again, the management of the overtime system is work of the kind that Ostrowski was employed to perform and is actuated by a purpose to serve the postal service. Moreover, Plaintiff has not presented any evidence to the Court that contradicts the government's explanation and characterization of the conduct involving the overtime assignments. Accordingly, the Court finds that this conduct was within the scope of Robinson and Ostrowski's employment and is properly certified as against the United States.

Plaintiff alleges that Robinson ordered her to stop discussing Wainwright's prior acts of sexual harassment and threatened that she would be subject to a lawsuit if she continued. Significantly, she alleges:

26. On September 5, 1997 Postmaster Robinson called plaintiff into his office for a meeting. Robinson said it was not a union matter and met alone with plaintiff. During this meeting Robinson said that both Monagle and plaintiff's Union representative said that plaintiff was thinking of writing a letter to Barbara Paterson about Wainwright's sexual harassment charges. Robinson threatened that if plaintiff continued to talk about Wainwright's past, even if what she was saying was true, she could be sued. Robinson asked plaintiff if Wainwright was going to have to "pay" for the rest of his life for what he had done in the past, and said she was bitter. Robinson made it clear that he believed plaintiff was the true troublemaker and Wainwright was a victim.

Amended Complaint ¶ 26. The government states that Robinson was concerned that a letter to Barbara Paterson could lead to discord in the post office and may subject Plaintiff to another complaint filed by Wainwright. *See* Government's Reply at 10–11; Robinson Declaration ¶ 11. Robinson's advising and warning Plaintiff of the consequences that she might have to endure if she wrote a letter regarding Wainwright's behavior is the kind of function that he was employed to perform and was, according to Robinson, actuated to serve the postal service.

Here, Plaintiff alleges in her Amended Complaint that Robinson "threatened" her that she would be sued. In her EEO Investigative Affidavit, Plaintiff states only that she left the meeting feeling "threatened and upset" and that "Robinson made it clear that he believed I was a troublemaker and Wainwright was a victim." EEO Investigative Affidavit ¶ 17. Arguably, under certain circumstances, "threatening" employees is not within the scope of employment. However, Plaintiff's proffer merely suggests that she felt threatened and that Robinson did not believe her. This is not sufficient to create a genuine dispute regarding Robinson's intent. Accordingly, the Court finds that, in regard to the meeting on September 5, 1997, Plaintiff has not contradicted the government's objective explanation and that the conduct is within the scope of Robinson's employment and is properly certified against the United States.

Plaintiff also contends that Ostrowski purposefully forced Plaintiff to ride alone in her truck with a male employee, Bill Monagle, with whom she did not feel comfortable because of his relationship with Wainwright and the alleged false reports

he made to Robinson concerning Plaintiff. In regard to this incident, she alleges:

27. Following this meeting plaintiff spoke to her supervisor Tom Ostrowski and told him that when it was her turn to be inspected on her route, that she did not feel comfortable having Bill Monagle in her truck for a full day, given his ties to Wainwright and his false reports to Robinson. Ostrowski promised plaintiff that she would not have to go alone with Monagle. Ostrowski knew how upset plaintiff was about the ongoing harassment, as he would often come out to see her on her route and tell her that Wainwright's behavior was abhorrent, and that if Wainwright had done this sort of thing to his wife, Ostrowski would kill him.

29. On October 29, 1997 plaintiff was told by Ostrowski that Bill Monagle was going to accompany her alone in her truck for a "204–B" inspection. Plaintiff became very upset and reminded Ostrowski about his promise and how uncomfortable she was with Monagle. He nevertheless ordered plaintiff to go with Monagle. Plaintiff had a severe panic attack and left work and went straight to her doctor's office, crying, shaking uncontrollably, heart racing and her blood pressure had skyrocketed.

Amended Complaint ¶¶ 27, 29. The government counters Plaintiff's account and contends that Plaintiff never told Ostrowski or Robinson that she was having problems with Monagle and that Ostrowski never discussed Wainwright with Plaintiff. *See* Government's Reply at 11–12; Ostrowski Declaration ¶ 6; Robinson Declaration ¶ 12. The government explains that on October 29, 1997, when Plaintiff became upset about having Monagle accompany her, Ostrowski and Robinson simply decided to deny Plaintiff's request that a person other than Monagle supervise, having never granted such a request to an employee in the past. *See* Robinson Declaration ¶ 13; Ostrowski Declaration ¶ 7. Robinson and Ostrowski's decision to have Monagle supervise Plaintiff despite her request to have another supervisor is the kind of decision they are employed to perform and was actuated by a purpose to serve the postal service.

The fact that, in her Amended Complaint and EEO Investigative Affidavit, Plaintiff states that the decision upset her does not place it outside the scope of employment. Plaintiff attests in the EEO Investigative Affidavit that Ostrowski knew about the ongoing harassment, and that she became extremely upset and suffered a panic attack when Ostrowski denied her request to be accompanied by another supervisor. *See* EEO Investigative Affidavit ¶¶ 18–19. Notwithstanding her assertions, Plaintiff has not set forth facts that contradict the government's explanation that Robinson and Ostrowski refused Plaintiff's request because they had never granted such a request in the past. It is immaterial to the scope-of-employment analysis that Plaintiff was upset about their decision. Because Plaintiff's proffer does not create a genuine dispute regarding Robinson and Ostrowski's purpose in denying her request, the Court finds that the decision in regard to Plaintiff's supervision of her route by a male employee was within the scope of Robinson and Ostrowski's employment.

Plaintiff also contends that Robinson and Ostrowski intentionally ordered her to attend medical examinations to demonstrate that she was missing work for a medical reason in order to harass her. According to Plaintiff's allegations, they threatened to deny her sick leave and to subject her to discipline for missing work if she did not report to the medical examinations. In regard to this incident she alleges:

30. Plaintiff's doctor prescribed medication and told her to stay out of work until she was stabilized.

Medical documentation explaining why plaintiff would be out of work and her diagnosis was promptly sent to Robinson and Ostrowski. All necessary administrative paperwork was immediately forwarded to Ostrowski. At that time plaintiff had hundreds of hours of available sick time.

31. During her documented leave, plaintiff repeatedly received at her home orders from Ostrowski and Robinson to report for "fitness for duty" exams and to come to work and participate in a disciplinary investigation about her departure from work in October. Throughout this period of time plaintiff's doctor provided ample documentation concerning severe anxiety and depression, coupled with an extreme case of psoriasis. On the fitness for duty order, Ostrowski wrote that he questioned whether plaintiff's symptoms were work related and suggested that she was acting insubordinately by not returning to work. Robinson threatened plaintiff with discipline and denial of sick leave if she did not report to a medical exam scheduled by Robinson. Robinson and Ostrowski knew or should have known that they did not have authority to order plaintiff to undergo a medical exam, and did so in order to intimidate and harass plaintiff.

32. Two other women who were out of work from the Saco Annex on "stress leave" were ordered by Ostrowski and Robinson to undergo "fitness for duty" exams on or about the same time that plaintiff was so ordered. Males who were out on "stress leave" were not ordered to undergo any independent medical exams. Upon information and belief, one of the other women who actually attended the exam was asked by the doctor hired by the USPS if she was conspiring with plaintiff in raising false claims of sexual harassment.

Amended Complaint ¶¶ 30, 31, 32. The government counters that Robinson and Ostrowski believed, upon the advice of the postal service labor relations office, that the information supplied by Plaintiff about her illness was insufficient and that a medical examination was required to determine whether Plaintiff was unfit for work and eligible for sick leave. *See* Government Reply at 12–15; Ostrowski Declaration ¶ 8; Robinson Declaration ¶¶ 14–15. The government asserts that the information supplied by Plaintiff was insufficient in that it did not contain a prognosis or diagnosis of Plaintiff's condition. *See id.* The decision to order an employee to undergo an examination to determine her fitness for employment is the kind of conduct that Robinson and Ostrowski, in their supervisory positions, are employed to perform. Generally, such a decision is work related and is made by a purpose to serve the postal service in order to determine whether employees should receive paid sick leave. Plaintiff has proffered in her affidavit that throughout the time that Ostrowski and Robinson ordered her to report for "fitness for duty" exams, her "doctor provided ample documentation concerning severe anxiety and depression, coupled with an extreme case of psoriasis." EEO Investigative Affidavit ¶ 20. She further attests that "[o]nly when [her] lawyer intervened was [she] finally not harassed further about a fitness for duty exam and disciplinary action while out of work on my doctor's orders." *Id.* The facts related to the orders for medical examinations are in conflict. The government contends that they were made because Plaintiff's doctor had not provided all of the information qualified for sick leave and Plaintiff's proffer suggests that Robinson and Ostrowski had the necessary information and that the orders were made to harass her. Accordingly, the immunity-related facts that go to Robinson and Ostrowski's intent are in conflict, and a genuine dispute exists on

this record as to whether the orders were within the scope of their employment.

Plaintiff also contends that Robinson attempted to have Plaintiff's private insurance benefits denied. To that end, she alleges the following:

43. Plaintiff was informed by her Union steward on January 27, 1998 that Robinson wanted to see her in his office again. When Robinson learned that plaintiff wanted to take in a female representative instead of the male Union representative, the meeting was canceled. Robinson later intentionally misrepresented on a disability insurance form that plaintiff refused to attend the meeting he had called on January 27, in an attempt to have plaintiff's private insurance benefits denied.

44. Other false statements about plaintiff's alleged refusal to have street supervisors and leaving work in October without explanation were written on forms by both Robinson and Ostrowski in an attempt to deny plaintiff her disability benefits. With no medical evidence contradicting plaintiff's own doctors' diagnosis of post traumatic stress disorder and acute psoriasis caused by work related stress, Ostrowski and Robinson wrote that in their opinion, plaintiff did not have a disability.

47. On January 21, 1998 plaintiff gave Ostrowski a private disability insurance form that he needed to sign relating to her absence between October 1997 and January 1998. Ostrowski refused to sign the papers, even though plaintiff personally asked him about it many times. It was not until March of 1998 that plaintiff finally got the form signed, which only had to do with the length of plaintiff's absence. USPS, through Ostrowski, purposely withheld the form to make plaintiff suffer financially for the complaints she had made about sexual harassment.

Amended Complaint ¶¶ 43, 44, 47. The government contends that Robinson called the January 27, 1998, meeting because an occupational nurse advised him that the postal service should update Plaintiff about what she had missed while out on leave. *See* Government Reply at 17–19, 21; Robinson Declaration ¶¶ 20, 28. Robinson attests that he had conducted similar meetings on several prior occasions under similar circumstances and no other employee had insisted upon being accompanied by another employee. *See* Robinson Declaration ¶ 28. Robinson denied Plaintiff's request and canceled the meeting when Plaintiff refused to participate without a female employee. *See id.* Furthermore, Ostrowski and . Robinson explain that they believe the statements that they made on Plaintiff's disability form are accurate. *See* Robinson Declaration ¶ 30; Ostrowski Declaration ¶ 12. Neither Robinson nor Ostrowski explain why Plaintiff was required to ask several times for what appears to be a routine request for a signature. However, Ostrowski does declare that he was confused by the form because it appeared that his signature required a conclusion that Plaintiff was disabled, which he did not support. *See* Ostrowski Declaration ¶ 12.

Robinson and Ostrowski's determination that Plaintiff was not disabled, and their inclusion in the disability application of the events regarding the Monagle-supervision issue and the circumstances surrounding Plaintiff's absence, are tasks and decisions that are of the kind they are employed to perform in their supervisory positions. Furthermore, they were actuated by the purpose of serving the postal service in its determination of whether Plaintiff was disabled.

Plaintiff proffers that she believes Robinson's cancellation of the meeting was an act of discrimination, retaliation, and harassment because he believed that she

and Mary Ann Hackett, the employee whom Plaintiff wished to attend the meeting with her, were conspiring to bring charges of sexual harassment. *See* EEO Investigative Affidavit ¶ 29. She also attaches a memorandum, dated January 18, 1998, allegedly written by Robinson, wherein he writes that he believes that Plaintiff pressured Hackett to file sexual harassment charges. *See id.,* Exhibit A. She further attests that Robinson represented on the disability form that she missed the meeting without explanation when she had, in fact, told Robinson that she was ill. *See id.* ¶ 29. Plaintiff also submits in her affidavit that on January 21, 1998, Robinson purposely withheld the disability insurance form to make her suffer financially for her sexual harassment complaints. *See id.* ¶ 33. From Plaintiff's evidence, one can infer that Robinson and Ostrowski had a private, non-work-related purpose when Robinson stated that he did not believe that Plaintiff was disabled and when Ostrowski delayed signing the form. Thus, Plaintiff's proffer places genuinely in dispute, the facts regarding Robinson and Ostrowski's intent with respect to this conduct that are material to the issue of whether they are immune.

Plaintiff further contends that Ostrowski lengthened Plaintiff's mail delivery route in her absence and refused to provide her with assistance with finishing her route despite the fact that such assistance was routinely given to male employees.

45. After Ostrowski told plaintiff the meeting with Robinson was canceled on January 27 because plaintiff wanted a female present as her representative, plaintiff told him that she was leaving at her scheduled time of 4:00 for a doctor's appointment, that she was no longer on the overtime list due to medical reasons, and that therefore she would need help if her route was going to be completed. During plaintiff's absence her route had been lengthened, and the night previously plaintiff was out on the street until after 6:00 p.m. Ostrowski refused to give plaintiff help. This was harassment and retaliation because when other male employees cannot finish their route and cannot work overtime, they are given assistance.

Amended Complaint ¶ 45. The government characterizes this act as follows: Ostrowski reviewed Plaintiff's workload for the day and determined that she would be able to complete her route in time, if not early, and that Plaintiff did not need assistance. *See* Ostrowski Declaration ¶ 13. Furthermore, the government explains that Plaintiff's route had not been lengthened during her absence but, rather, that a "sequencing system" had been put into effect at the Annex and, as a result, the amount of time a carrier would spend actually delivering mail had increased while the amount of time sorting mail in the office had decreased. *See* Government' Reply at 19; Robinson Declaration ¶ 31. Robinson believes that although the number of customers had increased, the route could still be completed in eight or fewer hours. *See id.* The decision not to provide Plaintiff with assistance on her mail route is the kind of decision that Ostrowski was employed to perform in his position of supervising the distribution of mail and was actuated by a purpose to serve the postal service. Plaintiff has not disputed the government's explanation that a new sequencing system had been put into effect. In her EEO Investigative Affidavit, she asserts that she believes the denial of assistance on her mail route was an act of retaliation and harassment and that male employees' requests for assistance under similar circumstances were not refused. *See* EEO Investigative Affidavit ¶ 32. Again, the Court finds that Plaintiff's proffer places the immunity-related facts regarding intent in dispute.

Finally, Plaintiff argues that Robinson purposefully denied her sick leave despite the fact that she followed the proper pro-

cedure and had plenty of sick leave available.

46. On January 27, 1998 following Robinson's abrupt cancellation of the meeting after plaintiff requested a female representative, and Ostrowski's refusal to give plaintiff needed help with her route, plaintiff began to have a panic attack and felt very weak and sick to her stomach. Plaintiff told Ostrowski that she could not work any longer that day and that she was leaving and going to her doctor's immediately. Plaintiff left the Annex and went to Dr. Potyk's office hysterical, with acutely high blood pressure and extreme anxiety. The very next day Dr. Potyk faxed a medical note indicating that plaintiff was under her care and that it was unknown when she would return to work. Also on January 28, 1998 plaintiff filled out the necessary ps Form 3971 requesting sick leave for the 27th through the 30th of January. The medical note from Dr. Potyk and the 3971 form were submitted many days in advance of the end of that pay period, and plaintiff still had hundreds of hours of unused sick time. Nevertheless, her request for sick time was denied and plaintiff was charged with 5.67 hours of leave without pay by Robinson. The denial of plaintiff's request for sick time was another act of harassment and retaliation because there is no legitimate reason for denying her sick leave. Male USPS employees at the Saco Annex left work routinely, and as long as they obtained a doctor's note, filled out the necessary forms, and had available sick leave, their requests were granted by Robinson.

Amended Complaint ¶ 46. The government explains that when Plaintiff left work, the time keeper automatically placed her in a leave-without-pay status because, at the time, there appeared to be no acceptable reason for the leave. *See* Government's Reply at 20; Robinson Declaration ¶ 32. After Plaintiff's doctor sent a note, Plaintiff's supervisor approved Plaintiff's sick leave request but the time keeper neglected to change the leave status to paid sick leave. *See id.* This mistake has since been corrected, and Plaintiff has been paid for this leave. *See id.* Plaintiff alleges in her Amended Complaint that her sick leave request was denied in order to harass and retaliate against her. In her EEO Investigative Affidavit, Plaintiff does not contradict the government's explanation, but she feels that the denial of her request for sick time was another act of "harassment and retaliation" and that "male employees leave work all the time and as long as they obtain a doctor's note, fill out the necessary forms and have available sick leave, their requests are granted." *See* EEO Investigative Affidavit ¶ 32. Plaintiff's proffer creates a conflict in the immunity-related facts.

In summary, the Court finds that the government has provided objective work-related justifications for each of the nine acts and incidents involving Robinson and Ostrowski. In regard to three of the nine acts, Plaintiff did not present any evidence of facts that Robinson and Ostrowski acted with an intent that would place the conduct outside the scope of employment. Specifically, the conduct is 1) the alleged manipulation of the overtime list in paragraph 24 of the Amended Complaint; 2) the meeting on September 5, 1997, in paragraph 26 of the Amended Complaint; and 3) the Monagle supervision incident. With regard to these three acts, as the Court did in *Day*, this Court has before it a factual and exculpatory account of Robinson and Ostrowski's behavior juxtaposed with generalities in Plaintiff's papers regarding facts that are immaterial to the immunity issue. Accordingly, the Court finds that Plaintiff's proffer does not justify the need for an evidentiary hearing as to those three acts and will grant the government's mo-

tion to substitute the United States as party defendant to answer to them.

With respect to the remaining six acts, Plaintiff has proffered evidence that disputes the government's characterization. She has presented facts of evidentiary quality in the EEO Investigative Affidavit that create a genuine dispute as to the character of the acts in question—namely, whether Robinson and Ostrowski acted with a private, discriminatory purpose or with a work-related purpose. Because un-der Maine law, acts taken with a non-work-related, private purpose are outside the scope of employment, a genuine dispute exists as to whether Robinson and Ostrowski are immune from suit.[6] In accordance with *Lyons* and *Day*, the Court will hold an evidentiary hearing to resolve the immunity-related issues. At the hearing, Plaintiff will be required to meet her burden of proving that Robinson and Ostrowski acted with a non-work-related motive when they engaged in the incidents listed in this decision.[7]

6. In Plaintiff's Objection to Defendant Henderson's Motion for Substitution and Motion to Dismiss, In Part and in Plaintiff's Surreply Regarding Federal Defendant's Motion to Substitute and Motion for Partial Dismissal, Plaintiff asserts several broad arguments against the Westfall certificate which the Court rejects. Plaintiff argues generally that the acts of Robinson and Ostrowski "raise questions as to improper motives, beyond the authorized scope of employment" and that these actions served no purpose of the postal service. Plaintiff's Objection at 4. However, as discussed, the United States Court of Appeals for the First Circuit rejected the method of analyzing the claims as a whole for certification purposes when each claim includes multiple acts and incidents, as the Amended Complaint does here. *See Lyons,* 158 F.3d at 607.

Plaintiff further argues that the scope of the certification is not as broad as the government contends. She argues that the Westfall certificate in this case does not effectively immunize all of the actions of the individual defendants. However, the Supreme Court has cited with approval a Westfall certificate that stated no reasons for the scope-of-employment determination and only describes the relevant conduct generally. *See Gutierrez de Martinez,* 515 U.S. at 421, 115 S.Ct. at 2229. Furthermore, the United States Attorney states in the scope-of-employment certificate here that he certifies that Robinson and Ostrowski were acting within the scope of their employment as employees of the United States Postal Service regarding the issues related to the management and operation of the Biddeford Post Office, including personnel matters such as employee complaints, discipline, and other work-related concerns. The United States Attorney specifically states that he certifies the allegations contained in paragraphs 55, 58, and 61 of the Amended Complaint. These paragraphs incorporate the rest of the paragraphs in the Amended Complaint. Thus, the Court rejects Plaintiff's generalized argumentation and finds that the certificate is sufficiently specific.

7. The Court notes that in some cases, the resolution of immunity-related facts will necessarily result in the resolution of facts that go to the heart of the merits of a plaintiff's claims. Specifically, in reviewing a Westfall certificate, a court may be asked to decide an issue of fact that is common to both the validity of the Westfall certificate and to the merits of the controversy—particularly whether the federal employee acted with deliberate intent to inflict emotional distress, harass, or retaliate against the plaintiff. Although the *Wood* court draws a line between the "harm-causing incident" and the facts that go to the characterization of that act, in some cases a district court is in the position where, to determine the validity of the Westfall certificate, it must resolve issues of fact regarding intent that hold the potential to have ultimately, dispositive effect on the merits of plaintiff's claim in the same proceeding.

The majority in *Wood* does not address the situation where this commonality may occur or advise what the effect of an earlier resolution of an issue of fact in the review of a Westfall certificate has on the merits of the claims in the case. Although acknowledging that administrative problems may result from drawing a line between the harm-causing incident and the characterization of that incident, the *Wood* court reasoned that they were not insuperable and that these kinds of cases are rare. *See Wood,* 995 F.2d at 1130. The Court questions the rarity of these cases today, given the rise in employment discrimination suits against federal employers that include claims that contain elements involving the intent with which acts are alleged to be taken against individual employees.

The dissent in *Wood* (Coffin, J.) stated that, where the same issue is common to the validity of the certificate and to the merits of the controversy, the reviewing court should re-

### B. Motion For the Entry of A Default Judgment Against Robinson and Ostrowski.

Having concluded that an evidentiary hearing is necessary to determine whether the United States is the proper party defendant to Counts IV, V, and VI, and whether Robinson and Ostrowski are immune from suit, the Court must consider Plaintiff's motion to enter a default judgment against Robinson and Ostrowski. The Court will not enter a default judgment against Robinson and Ostrowski. The United States in its Answer denied, on behalf of Robinson and Ostrowski, the claims and allegations set forth against them in Plaintiff's Amended Complaint. Although neither Robinson nor Ostrowski individually filed an answer, the government's Answer, wherein it responded on their behalf, suffices. Therefore, the Court will not enter a default judgment against Robinson and Ostrowski, and Plaintiff's motion will be denied.

### C. Ancillary Issues.

Having determined that three of the nine acts in the Amended Complaint that involve Robinson and Ostrowski are properly certified to the United States and that an evidentiary hearing is necessary to determine whether the remaining six acts are inside or outside of the scope of employment, the Court must determine the present status of the parties to this action. Because the Court holds, in accordance with its decision herein, that three of the nine of the incidents that make up Counts IV, V, and VI are properly certified to the

United States, Robinson, and Ostrowski are immune from suit for these three acts. As to these three acts, the United States is substituted as a party to Counts IV, V, and VI.

The question that remains is whether the United States is to be substituted before the Court completes the evidentiary hearing on the scope-of-employment issue, as the party defendant in respect to the remaining acts, by virtue of the Westfall certificate. Plaintiff contends that Robinson and Ostrowski are defendants until, if it is to be the ultimate result, the Westfall certificate is upheld by the Court. The government counters with the plain language of the statute, which provides that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment . . . any civil action . . . commenced in a United States district court *shall be deemed* an action against the United States." 28 U.S.C. § 2679(d) (emphasis added). However, any judicial "review" of the question of whether Robinson and Ostrowski are entitled to immunity in respect to the six acts on which an evidentiary hearing is to be conducted cannot be completed until that process is, itself, complete. Here, there is a tension between the achievement of the immunity determination's purpose of relieving Robinson and Ostrowski of the burden of proceeding through any phase of the judicial process if they are, in fact, immune

solve the issue of fact in an evidentiary hearing and dispose of the merits of the claim at the same time if dispositive. *See id.* at 1336. The dissent reasoned that in a case where the federal employee completely denied the conduct:

It seems quite likely that the evidentiary hearing before the district judge would be an efficient course: if [the defendant employee's] version of events were accepted after the hearing, that finding would sustain the certificate and (by collateral estoppel) dispose of [plaintiff]'s claim on the merits at the same time. If instead [plaintiff's] ver-

sion were accepted, then we think [the defendant employee] would similarly be bound by the result; he would be resubstituted as a defendant, and the case would proceed before a jury on other unadjudicated issues, such as the issue of damages. The dissent further reasoned that it was not troubled that a plaintiff would be deprived of trial by jury on an issue that goes to the heart of the merits, as well as to the validity of the certificate. *Id.* at 1136–37. The Court need not and does not here determine the effect on Plaintiff's claims of its final determination on the scope of employment issue.

from suit and the promotion of judicial efficiency in these circumstances.

The Court agrees with the government that the language of the Westfall Act implies that the United States is properly substituted as the party upon the filing of the Westfall certificate by the Attorney General and, thus, pending review by the district court. However, substituting the United States in this case prior to conducting the evidentiary hearing would likely result in an extreme waste of judicial resources. Because the immunity issue in this case primarily involves the intent and motive of Robinson and Ostrowski, the Court believes that discovery may be necessary prior to the evidentiary hearing. The Court may determine after the evi-

dentiary hearing that the remaining six acts involving Robinson and Ostrowski are not properly certified and that Robinson and Ostrowski are not entitled to immunity. If the United States has been substituted as the party defendant as to *all* of the relevant acts between the filing of the Westfall certificate, and after the evidentiary hearing and resolution of the issues generated thereby, the Court concludes that Robinson and Ostrowski are proper defendants, Robinson and Ostrowski would be required to step back into the case as defendants, possibly after discovery is concluded. The Court finds that this would result in an avoidable waste of judicial resources and should be eschewed.[8] Ac-

---

**8.** The Court's decision here is in accord with the decision of the United States Court of Appeals for the First Circuit in *Nasuti v. Scannell,* 906 F.2d 802 (1st Cir.1990). In *Nasuti,* a federal employee sued a co-employee for assault and battery in state court. Following the enactment of the Westfall Act, the United States Attorney certified that the co-employee had been acting within the scope of his employment and filed a notice of removal and a motion to substitute the United States as the sole defendant to all of the state law claims. *See id.* at 807. Plaintiff filed a motion to remand, which the district court granted without making an independent scope-of-employment determination. *See id.*

The United States argued that the district court's remand order was an appealable final order because it effectively dismissed the United States as a defendant from the case, and did so in violation of the Westfall Act, 28 U.S.C. § 2679(d)(2), which makes the Attorney General's scope certification conclusive. *See id.* at 807. "In the government's view, the Attorney General's scope certificate conferred jurisdiction upon the district court which the court could not override, at least without any finding of its own that defendant Scannell had acted beyond the scope of this employment." *Id.* The United States Court of Appeals agreed with the government and held that a federal court must make an independent determination of the scope of employment issue to determine its subject-matter jurisdiction and resolve disputed rights. *See id.* at 808. Accordingly, the Attorney General's certification conclusively established scope of employment for removal purposes pending the district court's independent scope-of-employment analysis. *See id.* at 808. In *Nasuti,* the United States was substituted as the party

defendant prior to the United States District Court's scope-of-employment determination. This enabled that court to retain the suit in federal court pending its judicial review of the Westfall certificate. *See id.* at 813 ("[o]nly in relatively rare circumstances such as the present, where the facts underlying the scope issue are disputed, need the matter be independently resolved by the court and at all such times the government and the sued employee will have the benefit of a federal forum pursuant to the scope certification.")

The government here relies on *Nasuti* for the proposition that after the Westfall certificate is filed and before the Court conducts its scope-of-employment determination, the United States must be substituted as the party defendant. The Court finds that *Nasuti* does not stand for the proposition that the Court must substitute the United States as to the remaining six acts for the period prior to its final determination on the scope of employment issue. In *Nasuti,* had the United States not immediately been substituted as defendant prior to the scope-of-employment determination, the case could not have been removed to and maintained in federal court pending that court's review of the Westfall Certificate. In cases with the same procedural posture as *Nasuti,* granting conclusive weight to the certification enables the Attorney General to quickly remove cases from state court, and to maintain them in federal court where all questions affecting the rights and liabilities of federal employees while acting within the scope of employment will be resolved. *See id.* at 813. Here, immediate substitution of the United States is not necessary to facilitate removal and would thwart the Court's interest in judicial efficiency.

cordingly, pending the evidentiary hearing to determine whether Robinson and Ostrowski were acting outside the scope of their employment in regard to the remaining six acts, Robinson and Ostrowski remain party defendants as to Counts IV, V, and VI.

## CONCLUSION

The Court concludes that Plaintiff's proffer challenging the United States Attorney's certification of Robinson and Ostrowski warrants an evidentiary hearing to resolve the issue of whether Robinson and Ostrowski acted within the scope of their employment as to six of nine acts. The Court further concludes that the United States is a party defendant to Counts IV, V, and VI as those counts pertain to three of the nine acts. Robinson and Ostrowski remain defendants to Counts IV, V, and VI as those counts pertain to the remaining six acts. Accordingly, the Court **OR-DERS** that the United States of America's Motion to Substitute (Docket No. 5) be, and it hereby is, **GRANTED** as to the three relevant acts specified herein. An evidentiary hearing shall be conducted as to whether the remaining six acts are properly certified. The Court reserves ruling on the government's motion to dismiss until after the evidentiary hearing is completed. The Court further **ORDERS** that Plaintiff's motion for a default judgment against Robinson and Ostrowski (Docket No. 14) be, and it hereby is, **DE-NIED.**