Kathleen L. LYONS, et ux.,
Plaintiffs, Appellees,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Defendant, Appellee,

and

Nikhil I. Pathak, M.D. and United States
of America, Defendants, Appellants.

Nos. 97–2109, 97–2248.

United States Court of Appeals,
First Circuit.

Heard March 6, 1998.

Decided Oct. 21, 1998.

**606**

Mark W. Pennak, Appellate Staff, Civil Division, Department of Justice, with whom Frank W. Hunger, Assistant Attorney General, Jay P. McCloskey, United States Attorney, and Barbara L. Herwig, Appellate Staff, Civil Division, Department of Justice were on brief for appellant United States.

Alton C. Stevens with whom Marden, Dubord, Bernier & Stevens was on brief for appellant Nikhil I. Pathak.

Richard L. O'Meara with whom Murray, Plumb & Murray, Eric M. Mehnert and Jones, Bernstein & Mehnert were on consolidated brief for plaintiffs.

Before BOUDIN, Circuit Judge,
BOWNES and CYR, Senior Circuit Judges.

BOUDIN, Circuit Judge.

The United States and Dr. Nikhil Pathak, a federal employee, appeal from the striking of the U.S. Attorney's certification that Dr. Pathak was acting within the scope of employment when he allegedly committed certain of the acts that form the basis for claims against him. The claims, made by Kathleen Lyons, effectively charged Dr. Pathak with sexual harassment. This appeal involves the interpretation and application of the Westfall Act, 28 U.S.C. § 2679(d).

The facts, as set forth below, either are undisputed or are drawn from the complaint (and thus represent allegations taken as true only for purpose of this appeal). From 1989 to 1995, Kathleen Lyons was a head nurse in the renal dialysis unit of the Veterans Administration hospital in Togus, Maine. Her supervisor was Dr. Nikhil Pathak. According to Lyons, Dr. Pathak made advances to her while she and the doctor were attending a nephrology conference in Chicago in June 1994.

Lyons says that when she spurned Dr. Pathak, he retaliated against her by (for example) not talking to her at work, challenging her laboratory test requests, and writing up a complaint against her. Lyons claims that Dr. Pathak also made harassing comments, suggested that the dialysis unit might be closed, withdrew the unit from a research study, and questioned a police officer about missing log books, apparently implying that Lyons was somehow responsible for them. Lyons also says that the doctor inappropriately pushed her during the Chicago trip and inappropriately hugged her at the hospital in Maine.

In August 1995, Lyons filed suit in the federal district court. Putting aside a civil rights conspiracy claim later dismissed, the complaint charged the Secretary of the Department of Veterans Affairs as an employer with violations of Title VII, 42 U.S.C. § 2000e et seq., and charged Dr. Pathak with state law claims for infliction of emotional distress, slander, and assault and battery. The federal and state claims were separated for purposes of trial, and Lyons prevailed in a jury trial on the Title VII claims, obtaining a $375,000 judgment against the government; that judgment is apparently not yet final due to the continuing pendency of Lyons' state-law claims against Dr. Pathak.

Under the Westfall Act, the Attorney General can certify that a federal employee named as a defendant in a civil case was "acting within the scope of his office or employment at the time of the incident" that serves as the basis for a tort claim against that employee. 28 U.S.C. § 2679(d)(1). If the certification stands, the defendant federal

employee is immune from suit on claims arising from certified conduct, and the United States is substituted as the defendant with regard to those claims. *Id.* §§ 2679(b)(1), (d)(1). The employee can also petition the court to order certification if the Attorney General has wrongly refused to certify. *Id.* § 2679(d)(3).

On March 19, 1997, the U.S. Attorney for the District of Maine[1] certified that Dr. Pathak was generally acting within the scope of employment "regarding the issues directly related to patient care, clinical judgment, and hospital procedures and operations," including "allegations regarding critical values, physician's orders, rounds, and quality assurance reports." Specifically, the certificate identified 22 of 240 paragraphs of the complaint as comprising certified conduct; for example, the U.S. Attorney did not certify the alleged inappropriate hugging and pushing but did certify Dr. Pathak's work complaint against Lyons, his challenges to her test requests, and his refusals to talk to her at the hospital.

Scope of employment certifications by the government are reviewable by the district court. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 436–37, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). In April 1997, Lyons moved to strike the government's certificate and sought an evidentiary hearing. Dr. Pathak, who had earlier requested certification of all of his conduct, maintained that the government had not gone far enough in its certificate. The district court requested that all parties brief the issues and later heard oral argument.

On August 1, 1997, the district court issued an order striking the scope certificate entirely, holding that the government could not pick and choose among the alleged acts in the complaint; rather the court said that the correct approach was to evaluate whether in "the totality of the circumstances, the conduct alleged in the Complaint occurred within the scope of ... employment." Taking the complaint as a whole, the court said that sexual harassment amounting to assault and battery was clearly outside the scope of employment. This appeal followed, the government urging reinstatement of its original certificate and Dr. Pathak arguing that even more acts should have been certified.

At the threshold, Lyons says that the district court's order striking the certificate is not yet reviewable. Lyons recognizes that denials of immunity in the district court are customarily subject to immediate interlocutory appeal, *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), with an exception not here pertinent, *Johnson v. Jones,* 515 U.S. 304, 315–16, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), under the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). For this purpose, qualified immunity in federal civil rights actions and Westfall Act immunity are treated in the same fashion. *See Taboas v. Mlynczak,* 149 F.3d 576, 579 (7th Cir.1998).

Nevertheless, Lyons says that review now is premature because, even if the government's certificate were reinstated, Dr. Pathak would still have to stand trial for the uncertified acts alleged in the complaint. Thus, the disruption and delay of an interlocutory appeal would be incurred not to rescue a defendant from discovery and trial but merely to limit the claims against him. Whatever force the argument might otherwise have, it was rejected by the Supreme Court in *Behrens.* There the Court said that an interlocutory appeal lay from a denial of immunity even if granting it would not resolve the entire case. *See* 516 U.S. at 311–13, 116 S.Ct. 834.

Turning to the merits, the first question is to determine the "unit" for which certification is appropriate under the Westfall Act. Where a single case involves multiple claims, certification is properly done at least down to the level of individual claims and not for the entire case viewed as a whole. This is evident from *Behrens* itself as well as other cases approving certification of some claims but not others. *E.g., de Abadia v.*

---

1. The Attorney General has delegated the authority to make scope of employment certifications to the United States Attorneys with respect to civil actions brought against federal employees in their respective districts. *See* 28 C.F.R. § 15.3(a) (1997).

*Izquierdo Mora,* 792 F.2d 1187, 1190 (1st Cir.1986); *Araujo v. Welch,* 742 F.2d 802, 805–06 (3d Cir.1984).

 The harder question is how to handle a situation in which an individual claim taken separately encompasses multiple incidents. This question is posed by the present case; for example, Lyons' infliction of emotional distress charge embraces a whole series of individual incidents (*e.g.,* hugging, a negative report, refusing to converse). In all likelihood, we are addressing an issue to which Congress gave no thought when it framed the Westfall Act.

The Westfall Act is an offshoot of statutes imposing liability on the federal government for such events as accidents involving federal-employee drivers—events in which there is commonly a single incident (the crash) corresponding to a single claim (driver negligence). *See Behrens,* 516 U.S. at 303, 116 S.Ct. 834; *Nasuti v. Scannell,* 906 F.2d 802, 809 (1st Cir.1990). While Congress surely knew that a complaint may include multiple claims, a claim supported by many divergent acts is less common. Indeed, neither side has found a Westfall Act case that squarely addresses the issue we now face.

Statutory language—always the starting point, *Petitioning Creditors of Melon Produce, Inc. v. Braunstein,* 112 F.3d 1232, 1237 (1st Cir.1997)—lends some support to the government's act-by-act approach. The Westfall Act speaks of certification not of "the claim" but of "the incident out of which the claim arose," 28 U.S.C. § 2679(d); "incident" could easily be equated with "act" or "event." We do not think that either of Lyons' counters—that the word "incident" appears in the singular and that other related statutory provisions (*e.g.,* removal, 28 U.S.C. § 2679(d)(2)) explicitly operate on a claim-by-claim basis—are of much force.

Nevertheless, it is hard to make too much of this language where Congress may have assumed a rough equation of "incident" and "claim" and· where the problem in our case arises from a failure of the equation. Nor do

we have any direct evidence of congressional intent derived from legislative history. Lyons' argument that Congress did not intend to allow certification of "egregious misconduct," H.R.Rep. No. 100–700, 100th Cong., 2d Sess. 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949, does not seem to us to bear directly on the "claim versus incident" issue before us.[2]

 In granting Westfall Act immunity, Congress aimed to protect federal employees against personal lawsuits growing out of their routine conduct of official business. *See Wood v. United States,* 995 F.2d 1122, 1125–26 (1st Cir.1993). The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, had already made the government liable for certain wrongful employee conduct within "the scope of employment"; Congress simply provided in the Westfall Act, contrary to ordinary tort law, that the employee would be immune to suit for conduct within the scope of employment.

Given the objective to protect conduct within the scope of employment, we reject Lyons' notion that a plaintiff can defeat certification merely by choosing to plead two different acts under the heading of a single claim. Modern pleading is so flexible, and causes of action so numerous, that it is often child's play to combine as part of the same "claim" remotely related incidents. We are far less concerned about the possibility suggested by Lyons that a plaintiff might simply choose not to identify incidents in the complaint, thereby frustrating any effort to certify specific acts; discovery provides an easy remedy for that tactic.

Lyons is right that the incident-by-incident approach may increase the burden on the courts. It certainly would be quicker to make an all or nothing judgment as to each multi-incident claim, although not easy to invent a standard (would it be the predominance of scope versus nonscope conduct within each claim?). But mechanisms—such as special masters—exist for dealing with rou-

---

**2.** The issue is not whether "sexual harassment" by a federal employee can be immunized under the Westfall Act, but whether a specific act (*e.g.,* an adverse work report) can be used as an element of a broad-based sexual harassment claim if *that act* was done within the scope of employment.

tine, serial disputes, and our major concern must be to implement Congress' basic aim: to protect the employee for conduct within the scope of employment but not outside it. *See Wood,* 995 F.2d at 1125.

Finally, Lyons objects that the government, by certifying discrete incidents, can carve the evidentiary heart out of a case whose gravamen is a single course of conduct. But we see no reason why, subject to the sound discretion of the district judge, conduct within the scope of employment would automatically be excluded from evidence if it were offered merely to show pattern, motivation or anything else pertinent to imposing liability on the employee for conduct that has *not* been certified. *See United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *cf.* Fed.R.Evid. 404(b). Of course, the jury ought to be told of the limited purpose. *See* Fed.R.Evid. 105.

We thus conclude that the district court should have applied the scope test to acts or incidents, as the government claims. The government, although urging reversal, says that the district court has already developed the pertinent evidence and urges this court to decide which incidents should be certified. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 179 n. 29, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Dr. Pathak goes further, asking us to hold that the government should have certified additional conduct. Lyons, by contrast, asks for a remand to decide what should be certified. A remand cannot be avoided, but we can and will narrow the issues for the remand.

■ Under the Westfall Act, private action is barred against an employee of the federal government for a "negligent or wrongful act or omission of [the employee] ... while acting within the scope of his office or employment...." 28 U.S.C. 2679(b)(1). Federal law determines whether a person is a federal employee and defines the nature and contours of his official responsibilities; but the law of the state in which the tortious act allegedly occurred determines whether the employee was acting within the scope of those responsibilities. *Aversa v. United States,* 99 F.3d 1200, 1208–09 (1st Cir.1996).[3] Here, only the latter issue is in dispute.

All sides appear to concur that the scope issue should be determined under Maine law (although a few of the acts occurred outside Maine). As elsewhere, the scope-of-employment issue in Maine is normally resolved not to give immunity to the employee, but to impose vicarious liability on an employer under the *respondeat superior* doctrine. Maine's courts follow the tests set forth in the *Restatement (Second) of Agency* § 228 *et seq.* (1958). *See McLain v. Training and Development Corp.,* 572 A.2d 494, 497 (Me. 1990). The *Restatement*'s general rule § 228 reads as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> >
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

The rule is given more content by a further 24 pages containing subordinate rules, commentary and illustrations, *see Restatement, supra,* §§ 228–236, and by case law and rules of thumb. For example, usually— but not always—acts relating to work and done in the workplace during working hours are within the scope, *see id.* §§ 229, 233, 234;

---

3. It might seem surprising that the federal statutory immunity of a federal employee to suit for official acts should turn on state law. But the choice was deliberate, *see Aversa,* 99 F.3d at 1209 (citing H.R.Rep. No. 100–700, *supra,* at 5949) and was based upon the earlier decision in adopting the Federal Tort Claims Act to rely upon state law to establish employer responsibility from the conduct in question. *See* 28 U.S.C. § 1346(b); *FDIC v. Meyer,* 510 U.S. 471, 477–78, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).

negligent performance of duties is within the scope, *see id.* §§ 232–233, while serious intentional wrongdoing is outside it, *see id.* § 231 & cmt. a.; and the motivation of the employee (to serve the master's interests or his own) is often an important element, *see id.* §§ 235–236.

Set forth in an appendix to this opinion is the full text of each paragraph listed by the U.S. Attorney as certified. Most of the acts in these 22 paragraphs appear on their face to be work-related. For example, paragraph 59 says that "[i]n August 1994, Dr. Pathak logged a Complaint with William Harnass and Dr. Holyoke, Chief of Staff, against Mrs. Lyons." Paragraph 115 says, "[o]n February 23, 1995, Dr. Pathak announced to the Renal Dialysis Unit that 'they' were considering closing the Renal Dialysis Unit." Paragraph 129 says:

On March 13, 1995, without telling Mrs. Lyons, Dr. Pathak withdrew Togus from the dialysis research study. The study had been the purpose of the June, 1994 trip to Chicago and would have enhanced Ms. Lyons' standing in the nephrology community.

Under *Wood v. United States*, 995 F.2d 1122 (1st Cir.1993), the district court in deciding the immunity issue must assume that the "harm-causing incident" alleged by the plaintiff did occur and must then resolve issues regarding the "characterization of the incident and subsidiary immunity-related facts." *Id.* at 1129. Here, Dr. Pathak's filing of a complaint and withdrawal from the dialysis research study were obviously work-related in the sense that these acts *might* have been taken to serve his employer; but they could also prove to be outside the scope of employment if they were done instead with a private purpose on Dr. Pathak's part to retaliate against Lyons for rejecting his advances.

If the complaint or the treatment of the study were done in good faith to serve the employer's interests, then the conduct was likely within the scope of employment even if Dr. Pathak's judgment was mistaken. *Restatement, supra,* §§ 232–33; *cf. Nasuti,* 906 F.2d at 808. Conversely, whatever justification Dr. Pathak might have for his actions could be overcome if his actual purpose was to retaliate, a motive that would convert his conduct into "serious intentional wrongdoing" outside the scope of employment. *Restatement, supra,* § 231 & comment a; *cf. Wood,* 995 F.2d at 1123. Of course, whether the conduct was objectively justified might play some evidentiary role in helping the judge decide whether the doctor's motive was professional or personal.

■ In challenging the U.S. Attorney's certificate, the burden is upon Lyons to prove any facts needed to contradict the government's characterization of the conduct in dispute. *See Rogers v. Management Technology, Inc.,* 123 F.3d 34, 36–37 (1st Cir.1997); *Nasuti,* 906 F.2d at 808. On remand, Lyons is entitled to challenge the certificate as to each of the 22 certified paragraphs. For example, Lyons asserts that Dr. Pathak did not honestly believe that the complaint he filed against her was true, and she asserts that Dr. Pathak's superiors had no intention of closing the dialysis unit. If her proffer so warrants, and the facts alleged are in controversy, then an evidentiary hearing may be required.

■ We turn now to Dr. Pathak's claim that the U.S. Attorney erred in refusing to certify other acts, apart from the 22 paragraphs, as within the scope of employment. For example, Dr. Pathak suggests that his alleged statement to Lyons that he "loved" her should be regarded as a misunderstood attempt by him to solve a workplace disagreement; his choice of words, he says, reflects the fact that English is not his native language. Although a few examples of this kind are given, Dr. Pathak's principal argument on appeal is that the district court erred in refusing to consider his claims on an act-by-act basis. We agree for reasons already stated.

If Dr. Pathak chooses on remand to pursue such claims, he (like Lyons) will bear the burden of proof in moving for certification under § 2679(d)(3). It will be up to him to offer whatever evidence is necessary to persuade the district judge that an individual alleged act, not found by the U.S. Attorney to be within the scope of employment, falls

within the scope of employment. And in soliciting a finding by the district court (*e.g.,* as to the motivation or circumstances surrounding an alleged act), Dr. Pathak (like Lyons) confronts the risk that an adverse determination may turn out to be harmful to him in the trial itself.[4]

The order of the district court striking the U.S. Attorney's certificate is *vacated,* and the matter is *remanded* to the district court for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX

52. The Defendant said, no one would do anything unless Ms. Lyons said so and that the plaintiff was "walking around in her white coat and high heels like she was a big person."

53. For the next three months, Dr. Pathak undertook a continuing course of harassment against Ms. Lyons which centered around work related issues.

55. Dr. Pathak would not communicate with Ms. Lyons, canceled meetings and, most importantly, publicly questioned Ms. Lyons's professional judgment on issues of critical labs, patient orders and the like.

59. In August 1994, Dr. Pathak logged a Complaint with William Harness and Dr. Holyoke, Chief of Staff, against Ms. Lyons.

61. The Complaint alleged that Ms. Lyons had maliciously locked Dr. Pathak out of the Dialysis Unit. Ms. Lyons never locked Dr. Pathak out of the Dialysis Unit. The Plaintiff expressed her concerns to Dr. Beaupre who told her not to take it seriously because we know it's not you.

69. On August 31, 1994, Ms. Lyons approached the Defendant Pathak with a list of suggestions as requested by Dr. Beaupre. Dr. Pathak responded, "I don't want to talk to you."

88. Dr. Pathak also asked Joe Morelli, a police officer at Togus, to question Ms. Lyons about missing log books.

91. On November 26, 1994, Dr. Pathak dictated in a patient HX and Physical that "the patient's family talked with the head nurse, Ms. Daigle."

115. On February 23, 1995, Dr. Pathak announced to the Renal Dialysis Unit that "they" were considering closing the Renal Dialysis Unit.

129. On March 13, 1995, without telling Ms. Lyons, Dr. Pathak withdrew Togus from the dialysis research study. The study had been the purpose of the June, 1994 trip to Chicago and would have enhanced Ms. Lyons' standing in the nephrology community.

130. Throughout March of 1995, Dr. Pathak continued to avoid Ms. Lyons at work and refused to speak with her. This made it extremely difficult for Ms. Lyons to do her job because Dr. Pathak was the director of the unit and directly responsible for providing Ms. Lyons with critical patient care information.

131. From November, 1994 through the present, Ms. Lyons has kept management updated about Dr. Pathak's behavior and the risk to patient care it has created, but nothing has changed.

132. On March 16, 1995, Ms. Lyons paged the Defendant with a question about patient care and Dr. Pathak refused to talk to Ms. Lyons.

133. On March 21, 1995, Ms. Lyons again attempted to talk to Dr. Pathak about a patient care issue, but only after repeated requests did Dr. Pathak supply her any information. Then, the information he gave was minimal.

134. Throughout March of 1995, Dr. Pathak refused to attend Renal Dialysis Unit staff meetings or do rounds with Ms. Lyons.

135. On March 31, 1995, Ms. Lyons questioned Dr. Pathak about a patient care situa-

---

4. *See Troy v. Bay State Computer Group, Inc.,* 141 F.3d 378, 383 (1st Cir.1998); *Restatement (Second) of Judgments* § 13, illus. 3 (1982).

tion needing immediate information and Dr. Pathak refused to talk with her.

140. On April 8, 1995, Ms. Lyons again tried to talk to Dr. Pathak about a patient care issue, but Dr. Pathak refused to even take her call. Ms. Lyons had to track Dr. Pathak down through the hospital before he would talk to her.

142. Dr. Pathak unreasonably and without discussion refused to allow the patient to see the video and ordered that the patient receive no more information about the treatment.

145. On May 15, 1995, Dr. Pathak scheduled two patients to come to the Renal Dialysis Unit but purposely refused to tell Ms. Lyons they were coming.

147. On May 24, 1995, in front of a fellow nurse, Ms. Lyons asked Dr. Pathak a specific question regarding preparing for transient dialysis patients. Dr. Pathak refused to answer her. She asked him another question and he refused to talk to her.

148. Throughout the week of May 25, 1995, Dr. Pathak refused to talk to Ms. Lyons at all. Dr. Pathak even planned the transfer of patients off the unit without ever informing Ms. Lyons, the head nurse.