John COYNE, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

No. C.A. 01–11270–NG.

United States District Court, D. Massachusetts.

May 30, 2003.

Harry L. Miles, Jon B. Heyman, Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, for John Coyne, Plaintiff.

Roberta T. Brown, Jeremy M. Sternberg, United States Attorney's Office, Boston, for Margaret Cronin, Unknown Assistant U.S. Attorney, Unknown Agents of the FBI Individually, Defendants.

## *MEMORANDUM AND ORDER RE: MOTIONS TO DISMISS*

GERTNER, District Judge.

### I. *INTRODUCTION*

Plaintiff John Coyne ("Coyne") alleges that defendants—the United States of America ("the government"), Special Agent ("SA") Margaret Cronin of the Federal Bureau of Investigation ("FBI"), an unknown assistant U.S. Attorney, and unknown FBI agents—cultivated him as a confidential prison informant and then exposed his identity and failed to protect him from violent retaliation. As a result, Coyne alleges, his teeth were broken in an assault and he continues to live in fear. His First Amended Complaint seeks damages for negligence (Count I); breach of contract (Count II); and constitutional *Bivens* claims (Count III). It also seeks injunctive relief (Count IV).

SA Cronin and the government have moved to dismiss the Amended Complaint. For the reasons set forth below, SA Cronin's motion [document # 27] is **GRANTED** with respect to Counts I, II and IV but is **DENIED** with respect to Count III. The government's motion [document # 28] is **GRANTED** with respect to Counts II,

III, and IV but is **DENIED** with respect to Count I.

### II. *LEGAL STANDARD*

In adjudicating a motion to dismiss, the Court must accept all allegations in the complaint as true and all reasonable inferences must be drawn in favor of the plaintiff. *See Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 255 (1st Cir.1994). The complaint should be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### III. *FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND*

Coyne alleges that in 1999, while he was incarcerated in Concord State Prison, in Concord, Massachusetts, he began to send unsolicited letters to the Concord Security Team containing information about corruption in prison and past or planned illegal activities by past and present inmates. In September of 1999, Coyne was brought to the U.S. Federal Courthouse in Boston and met in a conference room with an unnamed Assistant United States Attorney (AUSA), two FBI agents, and a Cambridge police officer assigned to the task force. One of the FBI agents, SA Cronin, who directed the meeting, expressed her appreciation for the information received from the plaintiff and stated that the information was accurate and reliable. Coyne then told SA Cronin that he had additional information about past crimes committed by some individuals who were specifically of interest to the government, but that he was concerned for his safety. SA Cronin assured Coyne of his safety and told him she would "take whatever steps necessary" to keep him safe. Coyne then relayed more information to SA Cronin.

During the course of the meeting, SA Cronin asked Coyne if he would pretend to be willing to take part in an armored car robbery that was in the planning stages. She instructed Coyne to send a letter to one of the individuals planning the robbery, an inmate at Norfolk State Prison. Because mail cannot be sent from one penal institution to another, SA Cronin instructed Coyne to send both a "dummy" letter, along with a second letter containing more information for the FBI, to a mail drop at an address she provided. SA Cronin further told Coyne that the letter to the target would then be forwarded to the inmate's girlfriend and that the letter containing the FBI information would be kept by SA Cronin herself. During the next month, Coyne followed those instructions and sent the requested letters to the FBI mail drop.

On or about October 5, 1999, Coyne again met with SA Cronin. SA Cronin stated that the FBI had made a "terrible mistake" and had forwarded the entire package of materials to the inmate's girlfriend, including the letter from Coyne to SA Cronin, which revealed that he was acting as a government informant. SA Cronin expressed her concern for the safety of Coyne and his family and promised to do everything necessary to help protect them. She subsequently called Maria Coyne ("Ms.Coyne"), the former wife of the plaintiff and mother of their four children, and informed Ms. Coyne that her family was in danger. To help protect Ms. Coyne and her children, she also called local police in Ms. Coyne's town to inform them of the potential danger.

After the meeting, another inmate accused Coyne of "ratting" on people. That inmate ultimately broke Coyne's teeth. Coyne was transferred to the Hampshire House of Correction for his protection, which prevented him from entering a half-way house program and resulted in a lengthier period of more stringent custody than he otherwise would have faced. Since his release from prison, he has lived in fear for his safety. The FBI and the U.S. Attorney's Office have refused to admit Coyne into the Witness Protection Program, despite his requests.

## IV. LEGAL ANALYSIS

### A. Scope of Employment Certification

The U.S. Attorney certified that SA Cronin was acting within the scope of her employment in relation to the events alleged in the complaint. Therefore, the defendants argued, the negligence claim lies only against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 and must be dismissed as to SA Cronin. Plaintiff moved to vacate the scope of employment certification [document # 32], which I previously denied for reasons I will now explain by way of background to my decision on the Motions to Dismiss.

■ Under the Westfall Act, the Attorney General may certify that a federal employee was acting within the scope of his/her office or employment at the time of an incident that serves as the basis for a common law tort claim against the employee. See 28 U.S.C. § 2679(d)(1); Lyons v. Brown, 158 F.3d 605, 606 (1st Cir.1998). The Attorney General's responsibility is delegated to the United States Attorneys. See id. at 607 n. 1. If the employee is certified, then he or she is immune from common law tort claims arising from certified conduct and the United States is substituted as defendant for those claims. Id. at 606–607.

■ Scope of employment certifications are reviewable by the district courts. See id. at 607. If challenged, the district

court must review the scope of employment issue *de novo,* and must not give deference to the U.S. Attorney's determination. *See Operation Rescue v. United States,* 975 F.Supp. 92, 102 (D.Mass.1997).

Plaintiff argued that allowing the employment certification without discovery would be premature, particularly in the absence of any indication that the U.S. Attorney conducted his own investigation. Plaintiff further argued that, since defendants acknowledge that SA Cronin lacked actual authority to offer entry into the Witness Protection Program, she was acting outside the scope of her employment. Neither argument could survive careful scrutiny.

A scope of employment certification clearly should not be vacated merely for lack of investigation by the U.S. Attorney. As the court explained in *Operation Rescue,* the remedy for any defect in employment certification is *de novo* review by the district court, not an inquiry into the U.S. Attorney's reasons for granting the initial certification. *See id.* at 102.

Here, moreover, the record is clear that SA Cronin was acting within the scope of her employment, at least with respect to the alleged negligent conduct of exposing Coyne's identity and failing to protect him. While federal law governs whether an individual is a federal employee and defines the "nature and contours" of her official responsibilities, the law of the state where the allegedly tortious act occurred determines the scope of employment. *See Lyons,* 158 F.3d at 609. Under Massachusetts law, the applicable test is whether the act in question was performed in furtherance of the employer's work. *See Clickner v. City of Lowell,* 422 Mass.

539, 542, 663 N.E.2d 852 (1996). Factors which may be considered in making such a determination are "whether the conduct in question is of the kind the employee is hired to perform, whether it occurs within authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer." *Id.* Here, it seems crystal clear that SA Cronin's dealings with Coyne as an informant were within the scope SA Cronin's employment under the *Clickner* criteria.

Plaintiff's only argument—that SA Cronin's alleged promise to place Coyne in witness protection was beyond her authority [1] and therefore outside the scope of her employment—cannot invalidate the certification. First, even if plaintiff's premise that SA Cronin's purportedly unauthorized promise falls outside the scope of employment were correct (which it is not), it would not follow that the negligent conduct at issue—exposing Coyne's identity and failing to protect him—also falls outside the scope of employment. *See Lyons,* 158 F.3d at 608–609 (explaining that scope of employment test should be applied to each alleged act or incident). Second, the complaint does not even allege that SA Cronin promised to put Coyne in *the* Witness Protection Program, only that "she would do everything that she could" to protect the plaintiff and his family. Finally, even if SA Cronin lacked authority to keep her promise, she clearly made it "to serve her employer" in the meaning of *Clickner,* placing it within the scope of employment.

### B. *Negligence (Count I)*

While the parties do not expressly parse the facts at this level, Coyne's complaint appears to contain two distinct negligence claims, each of which could be actionable

---

1. The parties agree that authority to enroll an individual in the witness protection program belongs exclusively to the U.S. Marshals Service under the relevant statute and regulations.

separately: 1) negligent disclosure of Coyne's identity as an informant; and, 2) negligent failure to protect Coyne from retaliation (whether by placing him in the Witness Protection Program or by taking some lesser steps to ensure his safety).

As explained above, SA Cronin's Motion to Dismiss the negligence claim must be granted because she has immunity under the Westfall Act pursuant to the U.S. Attorney's certification that she was acting within the scope of her employment.

The negligence claim against the government may be maintained only to the extent that sovereign immunity is waived by the FTCA. Subject to certain exceptions, the FTCA permits civil actions against the United States for personal injuries caused by the negligence of any employee of the government while acting within the scope of his/her office or employment under circumstances where a private person would be liable to the claimant. *See* 28 U.S.C. § 1346(b); *Wood v. United States*, 290 F.3d 29, 35 (1st Cir. 2002).

The defendants point to four theories that they claim preclude the United States' liability in this case: (1) lack of a "private person" analog; (2) misrepresentation exception; (3) postal matter exception; and (4) discretionary function exception. Upon careful consideration, however, none of these arguments is fatal to the plaintiff's claims and thus the government's Motion to Dismiss Count I must be denied.

### 1. *Private Person Analog*

The FTCA provides for government liability in the same manner and to the same extent as a private person in an analogous situation. *See* 28 U.S.C. § 1346(b); 28 U.S.C. § 2674. The government argues that because private persons cannot be liable under state law for the type of conduct alleged here, there is no liability under the FTCA. Plaintiff counters persuasively that the FTCA is not designed to immunize the government in areas where it has pre-empted the field and no private analog exists. It is also clear that private persons can be held liable for activities analogous to those alleged in this case.

The government's position—that there is no FTCA liability when a case alleges "the type of conduct that private persons could not engage in, and hence could not be liable for under local law"—is clearly a vast overstatement. In *Frutin v. Dryvit Systems, Inc.*, 760 F.Supp. 234 (D.Mass. 1991), for example, the court held that an air traffic controller's failure to provide a traffic advisory was actionable. *See id.* at 237. The court categorically rejected "the argument that the FTCA imposes no liability for the performance of activities which private persons do not perform." *Id.* (citing *Indian Towing v. U.S.*, 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1995) (holding that U.S. could be liable under FTCA for the Coast Guard's negligence in the operation of a lighthouse despite the fact that private persons are not liable under state law for negligent lighthouse operation)).

Coyne does not expressly articulate a theory under which the allegations of this case fit the contours of an established state law tort. He attempts to draw an analogy between the FBI protection of confidential informants and corporate protection of employee informants in internal investigations. However, he cites no authority to suggest that a private corporation would be liable, under Massachusetts law, for a specific tort of breaching an employee's confidentiality or failing to protect him.

Fortunately for Coyne, an analogous tort is not necessarily an identical tort; the issue can be decided at a somewhat higher level of abstraction. It seems clear

that the facts Coyne alleges could well, for example, make out a claim for a broadly applicable state law tort such as negligent infliction of emotional distress. *Cf. Santiago–Ramirez v. Secretary of Defense*, 984 F.2d 16, 21 (1st Cir.1993) (holding that claim for intentional infliction of emotional distress is actionable under FTCA even though substance of allegations overlaps with false imprisonment, which is excluded from FTCA). Coyne's allegations that the government voluntarily assumed certain duties toward him also could state a claim for "good Samaritan" liability, as defined in the Second Restatement of Torts and recognized in Massachusetts. *See Davis v. Westwood Group*, 420 Mass. 739, 746 n. 12, 652 N.E.2d 567 (1995) (recognizing "good Samaritan" principles articulated in Restatement (Second) of Torts, § 323).

Notably, moreover, courts commonly have reached the merits of similar "failure to protect informant" allegations despite the apparent lack of an obvious private person analog. *See, e.g., Miller v. U.S.*, 530 F.Supp. 611, 615 (E.D.Pa.1982) (denying motion to dismiss claim based on failure to protect informant); *Ochran v. United States*, 117 F.3d 495, 506 (11th Cir.1997) (acknowledging that government may have duty to protect informant but finding that discretionary function exception precludes liability for the manner in which protection is provided). While these cases did not specifically engage the question of a "private person" analog, they suggest that Coyne's theory of FTCA liability is not, in any sense, unusual or farfetched.

## 2. *Misrepresentation Exception*

Defendants argue that the United States cannot be held liable under the FTCA for providing Coyne with mistaken informa-

tion, specifically, an incorrect mailing name and/or address for his "sting" letters. Defendants base this argument on the FTCA exemption for misrepresentation, 28 U.S.C. § 2680(h). There are two fatal problems with this defense.[2]

First, Coyne has not alleged (because he does not know) how the "terrible mistake" of revealing his identity occurred. He does not allege that SA Cronin "misrepresented" either the drop box mailing address or how the transaction would take place. Prior to discovery, it is not possible even to assess whether the exposure of identity occurred because SA Cronin provided inaccurate mailing instructions to Coyne.

Second, the "misrepresentation exception" does not bar every claim in which the government's communication of errant information to the plaintiff played a role. Courts have "refused to bar suits against the government when the false statement ... was 'operational,' consisting, for example, of faulty aviation charts. In such cases, the false statement not only conveys information but operates as an instruction or a direction." *Jimenez–Nieves v. United States*, 682 F.2d 1, 4 (1st Cir.1982) (Breyer, J.). Here, incorrect communication of mailing instructions would be precisely this kind of "operational instruction" not immunized by the exception.

The "misrepresentation" exception is primarily directed at the separate, independent tort of misrepresentation, which "arose out of 'deceit,' initially in commercial contexts, where one party to a business transaction would falsely represent to another facts likely to influence the other's decision." *Id.* It is not directed at misrepresentation that is "merged" with "other

---

**2.** Significantly, moreover, even if the misrepresentation exception were applicable, it would not preclude Coyne's separate claim based on negligent failure to protect him from retaliation.

kinds of misconduct that forms the basis for separate torts." *Id.* (noting, for example, that "inducing a person to eat chocolates that are poisoned is considered a 'battery' " and that "restraining a person by falsely claiming legal authority to arrest him is considered 'false imprisonment,' " neither of which would be barred by the exception). The gravamen of Coyne's claims here is that the government negligently exposed him to danger and failed to protect him, not that it committed the separate tort of misrepresentation. *See also Muniz–Rivera v. United States*, 326 F.3d 8, 14 (1st Cir.2003) (finding that misrepresentation exception did not bar claim for negligent construction of home even though it barred claim that plaintiff relied on false information regarding condition of property).

### 3. *Postal Matter Exception*

The government also argues that there is no FTCA liability for "loss, miscarriage, or negligent transmission of letters or postal matter." 28 U.S.C. § 2680(b). However, Coyne does not allege loss, miscarriage, or negligent transmission of his mail. Rather, he alleges, the mail presumably was delivered flawlessly and the FBI simply passed along the wrong materials to the target inmate's girlfriend, thereby exposing his identity.[3]

### 4. *Discretionary Function Exception*

■ The government also contends that it is immune from liability because its management of confidential informants is a "discretionary function" in the meaning of the FTCA. However, the government's treatment of Coyne's allegations at this broad level of abstraction would enable the discretionary function exception to swallow

the FTCA "rule" of liability. In fact, neither of the particular negligent acts that animate Coyne's complaint—mistaken exposure of identity and failure to take any protective measures despite having made a decision to do so—implicates an actual exercise of choice or discretion that enjoys immunity under the statute. It is vitally important to recognize that "the government may not immunize an otherwise tortious action simply by showing that the government took the action in order to implement some policy purpose. Instead, the courts must carefully disaggregate the government's course of conduct in order to focus on the specific action at issue and determine whether that action was truly grounded in policy." Peter H. Schuck and James J. Park, *The Discretionary Function Exception In the Second Circuit*, 20 Quinnipiac L.Rev. 55, 73 (2000).

### a. *Background Principles*

■ The "discretionary function" exception to the FTCA confers immunity over claims "based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of this exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (internal citation omitted).

The First Circuit succinctly described the analytic framework to use when evalu-

---

**3.** As with the misrepresentation exception, even if the postal matter exception were applicable, it would defeat only a claim for

negligent exposure of identity arising from mishandling of the mail, not negligent failure to protect.

ating a "discretionary function" defense to tort claims against the government:

> First, an inquiring court must identify the conduct that allegedly caused the harm. Then, in determining whether Congress sought to shelter that sort of conduct from tort liability, the court must ask two interrelated questions: (1) Is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy related judgments? If both of these queries yield affirmative answers, the discretionary function exception applies and the government is shielded from liability.

*Muniz–Rivera,* 326 F.3d at 15 (citing, *inter alia, United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) and *Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. 1954).[4] While this inquiry might appear straightforward, the First Circuit has emphasized that it is "case specific, and not subject to resolution by the application of mathematically precise formulae." *Shansky v. United States,* 164 F.3d 688, 693 (1st Cir.1999). "Of course, case-by-case development has led to some disarray. These perorations cause us to despair of reconciling all the cases." *Id.* (internal citations omitted). To aid the inquiry here, I will nevertheless discuss by way of background two cases that illustrate critical unifying principles.

In *Shansky,* the plaintiff sought recovery for serious personal injuries suffered in a fall over an antique wooden threshold that lacked a handrail and warning signs at an exit from a national monument. *See id.* at 690. The court identified the "challenged conduct" as National Park Service's decision to abjure safety measures, such as a railing or warning sign at the exit, in a 1970 rehabilitation of the monument. *See*

*id.* at 691. The court further found that the Park Service enjoys discretion under relevant statutes, regulations, and policies that govern whether and how to implement safety measures, and that the exercise of that discretion implicates legitimate policy choices. The court explained:

> [T]he government's ultimate policy justification is that forgoing handrails and warning signs at the Northern Exit was the product of a broader judgment call that favored aesthetics over safety. Aesthetic considerations, including decisions to preserve the historical accuracy of national landmarks, constitute legitimate policy concerns . . . .
>
> [T]he statutory scheme empowers the Park Service to balance incommensurable values such as safety and aesthetics, and the Judicial Branch is ill-equipped to rework that balance.

*Id.* at 693.

Significantly, however, the court expressly distinguished the situation before it from a line of cases where courts had found that the government could be held liable for the failure to implement certain technical safety measures pursuant to prior policy choices. "Such [technical] decisions come within a category of objective professional judgments that, without more, are not readily amenable to policy analysis." *Id.* at 694. To further illuminate its reasoning, the First Circuit analyzed the holding in *ARA Leisure Serv. v. United States,* 831 F.2d 193 (9th Cir.1987), which involved a suit against the Park Service for failure to install guardrails on a stretch of roadway:

> The court [in *ARA Leisure* ] concluded that the Park Service's initial decision to design and construct a park road without guardrails was protected by the

---

4. Courts commonly refer to this framework as the *"Berkovitz–Gaubert* test." *See, e.g., Coul-*

*thurst v. United States,* 214 F.3d 106, 109 (2d Cir.2000).

discretionary function exception (principally on the ground that Park Service policies required roads to be "esthetically pleasing"), yet held that failure to maintain a certain stretch of the road in a safe condition was not grounded in policy (and, therefore, not protected). In a particularly revealing passage, the court explained that "where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing policy considerations, the rationale for the exception falls away and the United States will be responsible for the negligence of its employees."

*Shansky,* 164 F.3d at 694, n. 5 (quoting *ARA Leisure*). The First Circuit acknowledged that the outcome in *Shansky* "might be different ... had the Park Service committed itself to installing handrails and warning signs throughout [the monument] and then neglected the Northern Exit. In such a setting, one might argue that the Park Service's discretion was cabined by a prior policy judgment." *Id.* at 695.

In *Coulthurst v. United States,* 214 F.3d 106 (2d Cir.2000), the plaintiff prison inmate sought recovery for injuries suffered when a cable snapped on the weightlifting equipment he was using in the prison gymnasium. *See id.* at 107. He alleged negligence in that the defendant "failed to diligently and periodically inspect the weight equipment, and the cable" and also "failed to replace the cable after undue wear and tear." *See id.* at 108. The Second Circuit ultimately concluded that the suit could proceed. The court reasoned that negligence or abuse of discretion in the formulation of safety inspection policies and procedures would be immune from liability, but that certain species of negligence in the implementation of an established policy or procedure would not. *See id.* at 111.

On the one hand, the person charged with designing inspection procedures might have designed procedures that were deficient in that an inspector following those procedures would be likely to overlook, or fail to appreciate, a latent danger resulting from a frayed or strained cable. Similarly, the person deciding how frequently the inspection should be conducted might be negligent in that reasonable precaution might require more frequent inspections than provided in the schedule. We assume that if the negligence or carelessness involved in the case were of those sorts, the United States would be shielded from suit by the [discretionary function exception]. These types of negligently made decisions would involve elements of judgment or choice, would not be compelled by statute or regulation, and would be grounded in considerations of public policy since they would involve choices motivated by considerations of economy, efficiency, and safety.

On the other hand, the complaint's allegations of negligence and carelessness ... might also refer to a very different type of negligence. For example, the official assigned to inspect the machine may in laziness or haste have failed to do the inspection he claimed (by his initials in the log) to have performed; the official may have been distracted or inattentive and thus failed to notice the frayed cable; or he may have seen the frayed cable but been too lazy to make the repairs or deal with the paperwork involved in reporting the damage. Such negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy.

*Id.* at 109.

These cases illustrate the level of abstraction at which "challenged conduct"

should be defined and emphasize that there is a difference between conduct that implicates protected policy discretion and conduct that does not. With those illustrated background principles in mind, I now apply the First Circuit's version of the *Gaubert–Berkovitz* framework to the facts of this case.

### b. Identifying the Precise Conduct in Question

The government's attempt in this case to characterize the "challenged conduct" in the broadest possible terms as a general allegation of negligence in the management of a confidential informant is untenable. Clearly, the "management of informants" is not, itself, the challenged conduct. Rather, it is the general policy backdrop against which the court must apply the *Berkovitz–Gaubert* test to the specific instances of conduct that are, in fact, challenged.

Under the government's theory, conduct that bears any relationship to the management of an informant would be immune from liability. For example, suppose SA Cronin negligently became involved in a car accident while driving Coyne to a secret rendezvous with a target. According to the government's reading of the discretionary function exception, Coyne would be unable to recover for his injuries. After all, Cronin chose to drive Coyne rather than, for example, sending him to the meeting in a taxicab. She further made choices as a driver that resulted in a crash. Since all of these choices were part and parcel of Cronin's management of Coyne as an informant, the government would argue, her overall conduct is immune from suit in tort.

But this is not the law. As the Supreme Court explained:

There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267. The key point here is that the inquiry focuses on the discrete conduct—here, negligent driving—rather than a broader characterization of the driver's official duties.

As the First Circuit has emphasized, distinct allegations "are best handled discretely ... identifying the precise conduct in question." *Muniz–Rivera,* 326 F.3d at 15. Courts consistently focus on the particular events that proximately caused the injuries for which recovery is sought, not the broad policy authority pursuant to which particular actions were undertaken. Thus in *Shansky,* the court examined whether the specific decision not to install handrails was covered by the exception, not whether the government generally has discretion to choose among the nature and extent of safety measures (of course, it does). Likewise in *Coulthurst,* the court focused on scenarios of actual negligent weight machine inspection rather than the generalized discretion to ensure weight-room safety. The analysis in these cases flows directly from *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) where the Supreme Court held that careless maintenance of a lighthouse could trigger liability, even

though the government had discretion whether or not to build a lighthouse in the first place. *Id.* at 68–69, 76 S.Ct. 122. "The United States was held liable, not because the negligence occurred at the operational level, but because making sure the light was operational 'did not involve any permissible exercise of policy judgment.'" *Gaubert*, 499 U.S. at 326, 111 S.Ct. 1267 (explaining the Court's holding in *Indian Towing*).

In all of these cases, treatment of "challenged conduct" at a higher level of abstraction would have defeated the purpose of the discretionary function inquiry entirely. Obviously, at some level, the government has policy discretion to select and implement safety measures in various settings. For the discretionary function exception inquiry to have any meaning, it must be applied to more specific, concrete instances of conduct. As academic commentators have explained:

> Interpreting the [discretionary function exception] too broadly would defeat [the] purpose of both prongs of the *Berkovitz–Gaubert* test. First, even the most routine ministerial action by the lowest-level employee can be said to involve some judgment or choice. After all, the actor could have chosen to act differently, and might even have chosen to breach his duty. Were the [exception] to encompass all actions as to which the actor had such choices, it would literally swallow the FTCA's general waiver of immunity. Second, even the most routine agency action can always be linked to some general policy concern. After all, an agency action is ultra vires unless it is at least consistent with an authorizing statute or regulation .... To put the

point in a more economistic way, virtually any action, public or private, that purports to be rational reflects some form of cost-benefit analysis.

Schuck & Park, *supra*, at 65; *see also Shansky*, 164 F.3d at 692–93 ("We do not suggest that any conceivable policy justification will suffice to prime the discretionary function pump. Virtually any government action can be traced back to a policy decision of some kind, but an attenuated tie is not enough to show that conduct is grounded in policy"). While FBI agents surely have wide discretion in managing informants, it cannot be the case that everything they do in relation to that discretion is immune from liability.

In this case, Coyne seeks damages arising from two specific instances of government conduct: i) the mistaken exposure of his identity; and ii) the failure to protect him from retaliation despite having previously decided to do so. I treat each in turn under both prongs of the *Berkovitz–Gaubert* test.

### c. *Exposure of Identity*

 Coyne alleges that the exposure of his identity was not the product of any choice or judgment whatsoever but rather was an *admitted* "terrible mistake."[5] In the absence of any element of conscious choice, it is simply impossible to call the conduct "discretionary." *See Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954 ("conduct cannot be discretionary unless it involves an element of judgment or choice"); *Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir.1998)("the need to protect the exercise of policy judgment from the spectre of tort liability does not mean that Congress intended a ... mistake to be similarly

---

**5.** Coyne does not challenge, for example, SA Cronin's choice to use a "mail drop" to communicate, which presumably would be covered by the exception. Rather, he challenges her failure, in using that mechanism, to keep his identity confidential. This amounts to a claim of professional negligence, not failed policy judgment.

shielded"); *Collazo v. United States,* 850 F.2d 1, 3 (1st Cir.1988)(Breyer, J.)(holding that exception does not apply to medical malpractice, where only professional, rather than policy, discretion is at issue).

 Even if the exposure of Coyne's identity could somehow be traced to a choice or judgment exercised by SA Cronin, it would be premature to find her conduct "discretionary" prior to discovery of internal FBI policies and procedures which might bear on that conduct. Where an employee violates an established policy or regulation, "there will be no shelter from liability." *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267.[6]

Finally, even if I were to find that SA Cronin's specific conduct in exposing Coyne's identity was "discretionary," the exercise of discretion does not appear susceptible to policy-related judgments. The government here does not argue that discretion to expose informant identity is the sort of "judgment call" that Congress would protect from judicial scrutiny. Put another way, SA Cronin's negligence in this case looks more like the professional failure to maintain a lighthouse than it does a policy decision about whether or not to build one.

#### d. *Failure to Protect from Retaliation*

 Coyne's "failure to protect" allegations have several facets. Obviously, decisions about whether and how to protect Coyne from retaliation entail the exercise of judgment and choice. Whether such choices are actually "discretionary" in the

meaning of the exception cannot be decided prior to discovery of any established policies and regulations which may cabin this judgment. Coyne also alleges that, having made a policy choice to protect him, the government failed to follow through on its decision and did *nothing*. Such a complete failure to act on an established decision would fall outside the range of judgment that Congress sought to protect just like the failure to operate the lighthouse in *Indian Towing.*

The government's heavy reliance on *Ochran v. U.S.,* 117 F.3d 495 (11th Cir. 1997), for the broad proposition that the discretionary function exception precludes any claim arising from failure to protect informants is misplaced. *Ochran* did hold that "the AUSA's decision on how to provide protection . . . and whether to inform other components of the Justice Department of a threat . . . fall within the discretionary function exception." *Id.* at 506. However, the court also held that a claim based on the AUSA's failure to inform a witness of possible remedies against intimidation and harassment is not barred by the exception because "the duty to inform does not involve considerations of public policy." *Id.* at 504. Further qualifying its decision, the court noted that a "different result might have been reached . . . had [the AUSA] voluntarily assumed a specific duty that involved no policy judgments . . . For example, [had the AUSA promised] that she would station U.S. Marshals at [plaintiff's] door, but then failed to do so because [she] negligently misplaced the paper work and forgot about it, [her] negli-

6. The plaintiff points out that publicly-available Department of Justice Guidelines Regarding the Use of Confidential Informants from 2001 require that informant identity be kept confidential. While this particular policy post-dates the events of this case, it would not be surprising if Coyne were to uncover a

pre-existing similar policy in the course of discovery. Notably, even "informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary function exception analysis." *Irving v. United States,* 162 F.3d 154, 164 (1st Cir.1998).

gence might have been actionable under the FTCA." *Id.* at 506 n. 7.

The *Ochran* holding thus does not completely preclude liability for Coyne's claims in this case. While decisions about whether and how to protect Coyne may be immunized under the discretionary function exception (although this remains a matter for discovery concerning FBI policies and regulations), Coyne's allegation that the government did *nothing* to protect him after voluntarily taking on the obligation to do so is actionable. *See also Merced v. City of New York*, 856 F.Supp. 826, 831 (S.D.N.Y.1994)(holding that the government could not be held liable for its exercise of discretion whether or not to provide protection, but noting: "the Government admits that it 'may have a legal duty to protect' if it 'voluntarily assumed or incurred that duty to a specific individual' "); *Miller v. U.S.*, 530 F.Supp. at 615 ("Plaintiffs have alleged ... that they were promised protection by government agents who were fully aware of the grave risk confronting plaintiff[s], and that the protection was not provided .... Plaintiffs' complaint, therefore, can reasonably be construed as challenging the negligent execution of the decision to protect, and not as challenging the decision itself .... [N]egligent execution of policy is not shielded by the exception").

### e. *Conclusion*

In short, the purpose of the discretionary function exception is to protect actual government policy choices and decisions from second guessing, even where the choice or decision is negligent or abuses discretion. It does not protect negligent activities that do not implicate policy nor does it protect negligent performance or failure to perform specific decisions that have been made. Neither SA Cronin's admitted "terrible mistake" in exposing Coyne's identity nor her failure to follow through on her decision to protect Coyne is immune from liability in that framework.

### C. *Breach of Contract (Count II)*

Plaintiff asserts that SA Cronin, in her individual capacity, entered and then breached a contract to protect him. There is no indication, however, that SA Cronin made a *personal* guarantee of Coyne's safety, or that Coyne even interpreted the alleged promise that way. Rather, the only plausible reading of Coyne's allegations (confirmed by the U.S. Attorney's "scope of employment" certification) is that SA Cronin was acting in her official capacity in promising that the *government* would protect Coyne. *See Rodriguez v. Federal Bureau of Investigation*, 876 F.Supp. 706, 708 (E.D.Pa.1995)(explaining that action against FBI agent for breach of agreement to, inter alia, protect witness asserted claims against agents in official capacity and that U.S. was actual party in interest). The law has long been clear that federal officials are entitled to immunity from suit on claims based on breach of the government's agreement. *See Hodgson v. Dexter*, 1 Cranch 345, 363, 2 L.Ed. 130 (1803)("It is too clear to be controverted, that where a public agent acts in the line of his duty ... his contracts made on account of the government are public and not personal").

Plaintiff cites no authority for his assertion that SA Cronin's purported lack of actual authority to place an individual in the Witness Protection Program somehow renders her personally liable under the alleged contract. First, as explained above, Coyne does not actually allege that Cronin promised to place him in *the* Federal Witness Protection Program, but rather that she simply made vague assurances of protection. Second, even if Cronin made a promise beyond her actual

authority to keep, she was nevertheless acting within the scope of her employment when dealing with Coyne. Finally, "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Plaintiff concedes he has no contract claim against the government in this case.[7]

Therefore, the contract claims (Count II) must be dismissed against both SA Cronin and the government.

### D. *Constitutional Torts (Count III)*

 It is well-established that while plaintiffs may not recover damages from the United States for constitutional violations, so-called *"Bivens* actions" may be brought against federal officers in their individual capacities. *See Wigginton v. Centracchio,* 205 F.3d 504, 508 n. 5 (1st Cir.2000)("The term *Bivens* actions" derives from *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), authorizing damage actions against federal officials who allegedly engaged in unconstitutional conduct to a plaintiff's detriment"). Thus, the government's motion to dismiss Count III must be granted. At the same time, I conclude that Coyne states viable constitutional claims against the individual defendants, so SA Cronin's motion to dismiss Count III must be denied.

### 1. *Underlying Constitutional Violation*

Coyne alleges that SA Cronin violated his Fifth Amendment right to due process and Eighth Amendment right to be free of cruel and unusual punishment. His claims are not well-developed and essentially amount to a generalized assertion that the defendant's actions violated a generic right to safety that is protected by the Fifth and Eighth Amendments.

With regard to the Fifth Amendment claim, the defendant correctly points out that the "Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). "Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation ... would trivialize the centuries old principle of due process of law." *Id.* at 332, 106 S.Ct. 662. Defendants do not specifically engage the Eighth Amendment claim with separate analysis, but rather simply argue that "artful pleading" should not be used to elevate ordinary torts to constitutional dimension.

However, Coyne's allegations do not rest on mere negligence. While Coyne's argument is not expressly articulated in these terms, he clearly has potentially viable constitutional claims under a "deliberate indifference" theory. *See, e.g., Farmer v.*

---

**7.** Suit on any contract with the United States in excess of $10,000 must be brought in the Court of Claims. *See* 28 U.S.C. §§ 1346(a), 1491(a)(1); *Clinton v. Goldsmith,* 526 U.S. 529, 539 n. 13, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999). Defendants also had argued that the terms of the promise were not sufficiently definite to constitute a contract and that

Coyne had not pled that SA Cronin had actual authority to bind the government to *any* contract.

Coyne states that he is not pursuing a contract claim of under $10,000 (over which the court would have subject matter jurisdiction) and expressly waives any contract claim he might have against the government.

*Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (" 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment"); *cf. Butera v. District of Columbia,* 235 F.3d 637, 652 (D.C.Cir.2001)(holding that police had duty to protect undercover operative because, "the State [ ] owes a duty of protection when its agents create or increase the danger to an individual ... [l]ike prison officials who are charged with overseeing an inmate's welfare" and deliberate indifference to that duty violates the due process clause)(citing *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *see also Estate of Gilmore v. Buckley,* 787 F.2d 714, 722 (1st Cir.1986)(noting that special relationship between state and citizen may implicate due process where "the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself, or affirmatively places her in a position of danger that she would not otherwise have been in").

It can be fairly inferred from the allegations in the complaint that SA Cronin, knowing that Coyne was in danger, failed to take steps to inform prison officials of the risk or otherwise make provision for his safety. In other words, she was deliberately indifferent to the danger he faced. The constitutional dimension of deliberate indifference to Coyne's plight is compounded because he was both a prisoner and was in danger by virtue of his cooperation with the government. Of course, proving this claim will require a showing that the de-

fendant had actual, subjective knowledge of the risk to Coyne and did nothing to protect him—more than mere negligence.[8] But Coyne's allegations surely are adequate to survive a motion to dismiss.

### 2. *Qualified Immunity Defense*

■ The qualified immunity defense shields government officials "from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Here, the law was clearly established at the time of the events in the case that government agents may not be deliberately indifferent to prisoner safety or government-created dangers that cooperating citizens face; they have a duty to protect in such circumstances. Thus, the qualified immunity defense is unavailing.

I therefore conclude that SA Cronin's motion to dismiss must be denied with respect to the Count III *Bivens* claims.

### E. *Injunctive Relief (Count IV)*

Coyne's Amended Complaint sought an injunction to force defendants to fulfill their alleged promises of protection. He has now conceded, however, that he cannot obtain injunctive relief in this case, citing *Doe v. Civiletti,* 635 F.2d 88, 95 (2d Cir.1980)(explaining that Tucker Act does not provide equitable remedies such as ordering government to protect plaintiff or enroll her in witness protection program).[9]

---

**8.** If, for example, SA Cronin informed prison officials of the danger to Coyne and they then failed to protect him, she might arguably have fulfilled her constitutional obligations. Coyne then might still have potential claims against prison officials, but he has not named them as defendants in this case.

**9.** Of course, since Coyne did not bring this case in the Court of Claims under the Tucker Act, *Doe* does not speak directly to possible equitable remedies Coyne might have had in this action (*e.g.,* pursuant to constitutional *Bivens* claims). But in any event, Coyne now has expressly waived and/or withdrawn any request for injunctive relief.

Therefore, Count IV is dismissed with respect to both defendants.

## V. *CONCLUSION*

For the foregoing reasons, SA Cronin's Motion to Dismiss [document # 27] is **GRANTED** with respect to Counts I, II and IV but is **DENIED** with respect to Count III. The government's Motion to Dismiss [document # 28] is **GRANTED** with respect to Counts II, III and IV but is **DENIED** with respect to Count I.

**SO ORDERED.**